424 A.2d 1365

**In the INTEREST of S. M. S. 14599–A.**

**Appeal of C. B. and M. A. B., natural parents.**

Superior Court of Pennsylvania.

Argued Nov. 12, 1980.

Filed Jan. 23, 1981.

James P. O'Connell, Aliquippa, for appellants.

Shari F. Shink, Pittsburgh, for appellee.

James A. Esler, Assistant County Solicitor, for participating party.

Before CAVANAUGH, WATKINS and HOFFMAN, JJ.

HOFFMAN, Judge:

This appeal involves the custody of a child adjudicated dependent by the court below. Appellants (the child's natural parents) do not challenge the finding of dependency; rather, they contend that the lower court erred in ordering that the child continue in foster care under the supervision of Children and Youth Services of Allegheny County. We disagree and, accordingly, affirm the order of the lower court.

On March 14, 1979, while examining appellants' eleven-month-old son for an ear infection, Dr. Hedwig Marwaha noticed a number of bruises on the child's arm, back, cheek, and neck. The bruises appeared to Dr. Marwaha to be three-to-ten days old and unlike those which a toddler might ordinarily sustain in learning to crawl and walk. Appellant-mother, who had brought the child in for the examination, did not volunteer an explanation as to the cause of the bruises, but in response to Dr. Marwaha's questions stated that it was possible that her husband had struck the child. The mother also told Dr. Marwaha that her husband had been frustrated by the fact that their son didn't seem to like him. Based on this information and his observations, Dr. Marwaha notified Children and Youth Services of Allegheny County (CYS) that he suspected that the child had been abused.

On March 21, 1979, at a follow-up examination for the child's ear infection, Dr. Marwaha noticed several new, more severe bruises on the child's cheek and abdomen. These bruises appeared to be less than two days old. Once again the mother offered no explanation as to the cause of the bruises, and Dr. Marwaha again notified CYS of suspected abuse. Altogether, Dr. Marwaha had seen approximately

twenty bruises on the child during the two visits. An attachment was obtained that same day and the child was taken into temporary foster care. At a shelter care hearing on March 22, 1979,[1] the lower court ordered that the child remain in temporary foster care pending a formal hearing. CYS then filed a petition requesting that the child be declared dependent, and the lower court conducted a series of hearings during which it received testimony from the parents, Dr. Marwaha, a psychologist who had examined the child, and various social workers and psychiatrists who had come into contact with the family. Throughout these proceedings the child was represented by separate counsel. On April 4, 1979, after the first of these hearings, the court adjudicated the child dependent and continued the proceedings pending the results of parental counseling and investigation into the needs of the child. On December 19, 1979, after the final hearing, the court ordered that the child continue in foster care under the supervision of CYS. This appeal followed.

The evidence at the several hearings revealed that the parents were unmarried and living apart when the child was born in April, 1978, and that the father did not see the child until December, 1978. The parents married in January, 1979. Although the cause of the child's bruises was never firmly established, the evidence suggests that the father may have caused them by striking the child. Dr. Marwaha opined that, based on the number and nature of the bruises and his impressions from meeting the parents, one of the parents had injured the child. The mother testified that she believed that her husband had struck the child and reiterated that her husband had been frustrated because the child seemed to reject him. The father denied ever striking the child and asserted that some of the bruises had resulted

---

1. The Juvenile Act requires that such a hearing be held "not later than 72 hours after the child is placed in . . . shelter care to determine whether his . . . shelter care is required" prior to the full hearing on the petition for dependency. Act of July 9, 1976, P.L. 586, No. 142, § 2, as amended by the Act of April 28, 1978, P.L. 202, No. 53 § 29; 42 Pa.C.S.A. § 6332(a).

when the child walked across a room in their house and fell down a flight of stairs.[2] Other evidence, however, cast substantial doubt on this explanation. Roni Magalotti, a CYS caseworker, and Dr. Marwaha both testified that the child was unable to walk at the time the incident allegedly took place. Moreover, the mother had never offered this story as an explanation for the child's bruises, although the father assertedly had told her of the fall on the day it happened. Most importantly, the father admitted that his story did not account for the serious, fresh bruises which Dr. Marwaha observed on March 21. The matter was further clouded by the general evasiveness which the parents exhibited to doctors, social workers, and the court throughout these proceedings.

Additional evidence at the hearings suggested that the parents were undergoing substantial marital difficulties resulting, at least in part, from their anxiety over the dependency proceedings themselves. On at least one occasion the father struck the mother, and the mother expressed her fear of her husband to caseworker Magalotti and in her own testimony. After the initial hearing the mother entered a woman's shelter rather than return home with her husband. She rejoined her husband shortly thereafter. Thomas Calhoun, a clinical social worker and adult therapist who met with the parents several times at the outset of the case, testified that the dependency proceedings were placing a tremendous strain on the parents' marriage and that they were in need of counseling. The situation was complicated, at least initially, by the parents' antipathy toward the idea of counseling and the father's hostility toward Dr. Marwaha and the social workers associated with the case. After the April 4 hearing the family participated in a counseling program called "Begin Again" operated by the Parental Stress Center in Pittsburgh. In Begin Again the parents had supervised visitation sessions with their child and received counseling in parenting from program workers. Al-

2. The father testified that this incident occurred on or about March 10, four days before the child's first visit to Dr. Marwaha.

though initially there was substantial conflict between the father and members of the Begin Again staff, both parents showed progress in subsequent sessions. Notwithstanding this progress, neither Begin Again worker Kristi Adkins nor caseworker Magalotti recommended returning the child to the parents after only one cycle of Begin Again sessions. Instead, both recommended that the family participate in another cycle of Begin Again because further progress over a longer period of time was needed. Additionally, it was recommended that the father undergo a psychiatric examination.

The situation is further complicated by evidence that the child is hyperactive and needs an extraordinary amount of care and supervision. Dr. Vivian Harway, a child psychologist, spoke of the child's slow adjustment to his foster family and his extreme demands for attention. Moreover, according to Dr. Harway, the child regularly became extremely upset after his Begin Again visits with his parents, and upon returning to his foster home would kiss the furniture, gather all his possessions together in his room, and sometimes regurgitate. Further evidence of the child's condition is set forth in this passage from the opinion of the lower court:

Dr. Harway states that his gross motor skills are lagging, and he is only beginning to walk at this time [December 19, 1979, the date of the final hearing]. There has been significant progress, however, since at the time of placement he could neither walk nor talk, and in the six months since placement he is making progress in both areas. He is an impulsive child and needs someone with him constantly and his caretakers must be extremely patient. He is the kind of child who triggers serious problems in his interactions with adults and if the adults are not very stable, it could result in damage to the child either by child abuse or improper handling. He is showing signs of early learning disability which will become much worse if not treated correctly. His present adjustment is very fragile and he would seriously regress if moved. According to Dr. Harway his chances of making an adjustment

would be much better at a later time when his language skills had developed so he would have verbal memory instead of only the sensory memory that he presently possesses.

Opinion of the lower court at 6.[3]

At the final hearing the court learned that although the family had completed a second cycle of Begin Again, program coordinator Trudi Frisenda was unwilling to recommend that the child be returned to the parents because of their continuing marital problems.[4] She characterized these problems as "communication difficulties, [lack of] trust, and jealousy." She stated further that the father tended to dominate the mother and the mother tended to be passive in their relationship. Ms. Frisenda emphasized that the parents were consistently unwilling to discuss their problems with the Begin Again staff, and that in her opinion they needed additional counseling. Dr. Lena Huang, a psychiatrist who met with the father on two occasions and the family once, also testified that the parents were unwilling to discuss their problems and that both denied any difficulties between themselves and asserted that their son was an easy child to care for. She found these representations to be incredible and believed, based on her observations and on professional reports of the father's past history,[5] that the

3.   Our review of the record reveals that the quoted passage accurately summarized Dr. Harway's testimony.

4.   Ms. Frisenda, testifying on behalf of the Parental Stress Center, made no recommendation concerning the placement of the child. Acknowledging that it was "very unusual" for the Parental Stress Center not to make a recommendation, Ms. Frisenda explained that "because there are so many other agencies involved, . . . we did not feel we could evaluate their reports at this time."

5.   The father had been hospitalized for hyperactivity as a child in 1965. Dr. John Reinart, a child psychiatrist, testified that he had examined the father at that time and found him aggressive and extremely difficult to discipline. He treated him then and saw the father again in 1969, when he was displaying similar behavioral problems. Dr. Reinart met briefly with the father once more while he was participating in Begin Again. Based on his knowledge of the father's serious problems as a child and on their recent meeting, Dr. Reinart strongly recommended that the child not be returned and that the father be subjected to extensive psychiatric testing.

father probably had an impulse control disorder that entailed a high risk of future abuse if the child were returned to the parental home. She recommended that the father undergo a thorough, in-hospital neuro-diagnostic evaluation before any decision on reuniting the family were made. Adding to the complexity of this case is the fact that the parents were expecting a second child in March or April, 1980. Both caseworker Magalotti and Dr. Harway expressed the concern that the parents might be unable to tend to the needs of both a newborn baby and their hyperactive and demanding first child. Accordingly, they recommended that the child not be returned to the parents at the present time.

"The Juvenile Act [6] defines a 'dependent child', in relevant part, as a child who 'is without proper parental care or control, subsistence, education as required by law, or other care or control necessary for his physical, mental, or emotional health, or morals.' 42 Pa.C.S.A. § 6302." *In the Interest of Pernishek*, 268 Pa.Super. 447, 458, 408 A.2d 872, 877 (1979). Both the Act and our cases mandate that our courts: (1) may not find a child "dependent" absent clear and convincing evidence and (2) after making such a finding, may not separate the dependent child from his parents unless such separation is clearly necessary. 42 Pa.C.S.A. §§ 6301(b)(1) and (3) and 6341(c). *See In re Whittle*, 263 Pa.Super. 312, 397 A.2d 1225 (1979); *In re Clouse*, 244 Pa.Super. 396, 368 A.2d 780 (1976). To ensure a proper resolution of these issues, separate counsel should represent the child at the dependency hearing, and the hearing judge should conduct a comprehensive inquiry by receiving evidence from both interested and disinterested witnesses and should support his decision in an opinion in which he discusses and analyzes the evidence fully. *In re Hernandez*, 249 Pa.Super. 274, 376 A.2d 648 (1977); *In re Clouse, supra; In re La Rue*, 244 Pa.Super. 218, 366 A.2d 1271 (1976); *Stapleton v. Dauphin County Child Care*

6. Act of July 9, 1976, P.L. 586, No. 142, § 2, as amended; 42 Pa.C.S.A. § 6301 et seq.

*Service,* 228 Pa.Super. 371, 324 A.2d 562 (1974); *Commonwealth ex rel. Grillo v. Shuster,* 226 Pa.Super. 229, 312 A.2d 58 (1973).

*Id.* All of these standards are designed to limit "the Commonwealth's coercive interference with the family unit to those case where the parents have not provided 'a minimum standard of care for a child's physical, intellectual and moral well being.' *In re Rinker,* 180 Pa.Super. 143, 148, 117 A.2d 780, 783 (1955), cited with approval in *In re DeSavage,* 241 Pa.Super. 174, 360 A.2d 237 (1976)." *Id.*

■ Under the facts described above, we have no doubt, and the parents concede, that the lower court properly found the child in this case to be dependent. The evidence of the child's unusual and severe bruises clearly establishes that he had received substandard care in the past, and the virtually unanimous conclusions of the social workers, psychiatrists, and psychologist constitute clear and convincing evidence of the risk of substandard care if the parents were given custody at present. *See In the Interest of Clouse,* 244 Pa.Super. 396, 401, 368 A.2d 780, 782 (1976) (plurality opinion); *In the Interest of La Rue,* 244 Pa.Super. 218, 233, 366 A.2d 1271, 1278 (1976) (plurality opinion). The parents contend, however, that the evidence did not establish the "clear necessity" required to separate the family. *In the Interest of Pernishek, supra; In the Interest of La Rue, supra.* In the alternative, the parents contend that the court had a duty to consider other, less intrusive measures to remedy the problems which led to the child's dependency, a duty which it failed to discharge. We conclude that neither of these contentions warrant disturbing the decision of the lower court.

■ As indicated above, the virtually unanimous conclusion of the disinterested professionals who testified was that the safety and well being of the child would be jeopardized if he were returned to his parents at the present time. These opinions were based on the parents' continuing marital difficulties, the father's demonstrated volatility, the child's special and extensive needs, and the fact that the

parents were about to take on the added responsibilities and demands of caring for a new baby. We recognize that one of the stated purposes of the Juvenile Act is "[t]o preserve the unity of the family whenever possible." 42 Pa.C.S.A. § 6301(b)(1). We recognize also the risk of institutional insensitivity to the needs and real interests of troubled families that often attends proceedings such as these. As Judge SPAETH has noted:

> "At every point in the placement process children and their natural families are isolated from one another by the action and inaction of those with official responsibility. Pro-family rhetoric notwithstanding, a pervasive, implicit anti-family bias often shapes decisions about children at risk of removal or in out-of-home care."

*In re Kunkle*, 265 Pa.Super. 605, 615, 402 A.2d 1037, 1042 (1979) (Concurring and Dissenting Opinion) (quoting Children's Defense Fund, *Children Without Homes: An Examination of Public Responsibility to Children in Out-of-Home Care* 5 (1978)). Nonetheless, we are convinced that the evidence described above is sufficiently complete and compelling to establish the clear necessity for the continued separation of the child from the parents. *Compare In the Interest of Whittle*, 263 Pa.Super. 312, 397 A.2d 1225 (1979) (evidence insufficient to warrant separation); *In the Matter of DeSavage*, 241 Pa.Super. 174, 360 A.2d 237 (1976) (same). Moreover, we attach substantial weight to the opinion of the lower court judge, who had the opportunity to see, hear, and question the witnesses and who manifested such patience and thoroughness throughout the extended proceedings. *In re Kunkle, supra* 265 Pa.Super. at 606, 402 A.2d at 1038.

■ Similarly, we believe that the lower court gave due and proper consideration to alternative dispositions before ordering that the child continue in foster care. The record indicates that the parties and the court considered the possibility of an alternative program of counseling and supervision offered by the Parental Stress Center, which would have allowed the child to return home to the parents. Drs. Huang and Reinart and caseworker Magalotti all rec-

ommended against reuniting the family, however, because of the risk that the parents would not be able to cope with their child on a twenty-four hour, day-to-day basis. Moreover, Dr. Harway testified that the child's emotional development would best be served by waiting until his language skills have developed more fully before moving him from his present foster home. In light of these unanimous expert recommendations against returning the child to his parents, we cannot disagree with the lower court's decision not to pursue further alternative dispositions.[7]

Order affirmed.

**7.** We recognize, of course, that the situation may change in time. The parents may overcome their marital difficulties, and they may succeed in providing proper care for their new baby. The psychiatric evaluation of the father recommended in the proceedings below may dispel the doubts expressed as to his capacity to care properly for his son. Moreover, the child himself may progress to a point at which the adjustment to living with his natural parents may be somewhat easier. Accordingly, we remind the parents that, should circumstances change, they may seek a redetermination of the lower court's disposition.