456 A.2d 608

**In the Interest of Cheryl RHINE.**

**Appeal of Richard and Cheryl RHINE, Natural Parents.**

Superior Court of Pennsylvania.

Argued Aug. 31, 1981.

Filed Feb. 11, 1983.

Petition for Allowance of Appeal Denied June 2, 1983.

276

Carol S. Mills McCarthy, Pittsburgh, for appellants. Marc Drier, Pittsburgh, for appellee.

Before WICKERSHAM, WIEAND and BECK, JJ.

BECK, Judge:

Richard and Cheryl Rhine ("Appellants") appeal orders of the Court of Common Pleas of Allegheny County, dated April 16, 1980, and January 21, 1981, which indefinitely suspended Appellants' visitation with their natural daughter, Cheryl Ann Rhine, born May 19, 1978. We reverse and remand.

On December 5, 1978, Appellee Children and Youth Services of Allegheny County ("CYS") filed a petition alleging that Cheryl Ann was a dependent child within the intendment of the Juvenile Act ("Act"), 42 Pa.C.S. §§ 6301 et seq. After a hearing the court of common pleas entered an order on December 13, 1978, stating that Cheryl Ann was a dependent child and was to be "under supervision of [CYS], in the custody of [CYS] with permission for placement." Appellants appealed neither the court's determination of their child's dependency nor the court's transfer of temporary legal custody of Cheryl Ann to CYS.

On February 7, 1979, CYS placed Cheryl Ann with a foster family. In conjunction with the foster home placement Appellants and Cheryl Ann participated in a parent training program pursuant to which Appellants had weekly, supervised contact with Cheryl Ann.

In August of 1979 Cheryl Ann's foster mother reported to CYS that after visiting with Appellants, Cheryl Ann suffered from severe diarrhea, acted very aggressively toward her foster family, failed to maintain eye contact, and exhibited self-destructive behavior including banging her head and pulling out her hair. Thereafter, on the recommendation of a panel of CYS consultants, Appellants were permitted supervised visits with Cheryl Ann only one hour per month from September of 1979 through January of 1980.

Appellants were last permitted to visit Cheryl Ann on January 24, 1980. On April 2, 1980, the court of common pleas held the first of a series of evidentiary hearings concerning Cheryl Ann's welfare in relation to the discontinuance of Appellants' visitation. At the April 2 hearing the trial judge ruled that he had been presented with insufficient evidence to decide the matter properly. Accordingly, the parties were afforded two weeks within which to secure necessary witnesses.

Again, at a hearing conducted on April 16, 1980, and at hearings on September 3, 1980, and December 31, 1980, the trial judge refrained from issuing an explicit order regarding the discontinuance of Appellants' visitation and extend-

ed the period for judicial review so that the parties could adduce additional evidence.[1] Finally, after a hearing on January 21, 1981, the trial judge entered an order directing that Cheryl Ann remain in her "present foster home under [CYS] supervision" and that "termination of visitation ... remain in effect until further order of court."

On appeal to this Court Appellants question the guidelines by which the trial judge terminated their visitation with Cheryl Ann. Appellants argue (1) that the applicable standard of evidence is "clear and convincing"; (2) that the proper test for terminating visitation is "clear necessity," and (3) that the trial court lacked competent evidence to terminate Appellants' visitation.

Appellants first contend that because the instant controversy involves the child's natural parents and the state, the appropriate standard is clear and convincing evidence. An implicit corollary to Appellants' contention is that the state carries the burden of proof in such a dispute.

In *Addington v. Texas*, 441 U.S. 418 [99 S.Ct. 1804, 60 L.Ed.2d 323] (1979), the Court, by a unanimous vote of the participating Justices, declared: 'The function of a standard of proof, as that concept is embodied in the Due Process Clause and in the realm of factfinding, is to "instruct the factfinder concerning the degree of confidence our society thinks he should have in the correctness of factual conclusions for a particular type of adjudication." ' *Id.*, at 423 [99 S.Ct. at 1807], quoting *In re Winship*, 397 U.S. 358, 370 [90 S.Ct. 1068, 1075, 25 L.Ed.2d 368] (1970) (Harlan, J., concurring). *Addington* teaches that, in any given proceeding, the minimum standard of proof tolerated by the due process requirement reflects not only the weight of the private and public interests affected, but also a societal judgment about how the risk of error should be distributed between the litigants.

. . . .

1. Throughout the review period Cheryl Ann lived in the home of her foster parents and had no personal interaction with Appellants.

This Court has mandated an intermediate standard of proof—'clear and convincing evidence'—when the individual interests at stake in a state proceeding are both 'particularly important' and 'more substantial than mere loss of money." *Addington v. Texas,* 441 U.S., at 424 [99 S.Ct. at 1808].... [T]he Court has deemed this level of certainty necessary to preserve fundamental fairness in a variety of government-initiated proceedings ....

....

... Whether the loss threatened by a particular type of proceeding is sufficiently grave to warrant more than average certainty on the part of the factfinder turns on both the nature of the private interest threatened and the permanency of the threatened loss.

*Santosky v. Kramer,* 455 U.S. 745, 754, 102 S.Ct. 1388, 1395, 71 L.Ed.2d 599, 607–10 (1982).

While Pennsylvania courts have not heretofore analyzed the private interests affected by state opposition to parental visitation, recent court decisions have recognized that in custody disputes pitting a child's natural parents against the state, the private parental interest is legislatively protected. *Ellerbe v. Hooks,* 490 Pa. 363, 366–67, 416 A.2d 512, 513 (1980); *In re Hernandez,* 249 Pa.Super.Ct. 274, 279–80, 376 A.2d 648, 650–51 (1977). Since the considerations controlling custody disputes "apply with equal force to matters involving visitation," *Morris v. Morris,* 271 Pa.Super.Ct. 19, 29, 412 A.2d 139, 144 (1979), an examination of custody disputes between parents and the state is instructive in resolving the present visitation controversy.

Where the state opposes parents in custody matters our Legislature has established clear guidelines and procedures. Here either the Juvenile Act, 42 Pa.C.S. § 6301 et seq., or the Child Protective Services Law, 11 P.S. § 2201 et seq. are [sic] controlling. Yet the Juvenile Act has as its first express purpose: 'To preserve the unity of the family whenever possible,' § 6301(b)(1) and thus per-

mits state-enforced custody only when a child is found delinquent or dependent as defined by the Act .... *Ellerbe,* 490 Pa. at 366–67, 416 A.2d at 513.

The determination of custody under the Juvenile Act is a bipartite proceeding. *In re C.A.M.,* 264 Pa.Super.Ct. 300, 399 A.2d 786 (1979). Initially, an adjudicatory hearing is held to ascertain whether the child is dependent. At this stage of the proceeding " '[t]he burden of proof [is] on the party asking that the child be taken from its parents, and ... the evidence must be "clear and convincing." ' " *In re George,* 272 Pa.Super.Ct. 173, 184, 414 A.2d 1063, 1069 (1979) (Spaeth, J., concurring and dissenting) (quoting *In re LaRue,* 244 Pa.Super.Ct. 218, 228, 366 A.2d 1271, 1276 (1976); Section 6341(c) of the Act, 42 Pa.C.S. § 6341(c).

If the child is found dependent, the second, or dispositional, stage of the proceeding commences. The court conducts an evidentiary hearing to discovery the "disposition best suited to the protection and physical, mental, and moral welfare of the child ...." Section 6351(a) of the Act, 42 Pa.C.S. § 6351(a). The court may "[p]ermit the child to remain with [the] parents ... subject to conditions and limitations ... [or] transfer temporary legal custody to [*inter alia*] ... [a] public agency ..." *Id.* However,

> [t]he law is clear that a child should be removed from her parent's custody and placed in the custody of a state agency only upon a showing that removal is clearly necessary for the child's well-being .... [C]lear necessity for removal is not shown until the hearing court determines that alternative services that would enable the child to remain with her family are unfeasible.

*In re K.B.,* 276 Pa.Super.Ct. 380, 393, 419 A.2d 508, 515 (1980).

> Thus the situations in which the state may intervene are limited, and its burden is very heavy. These restrictions derive from the convictions that the family is one of our most important institutions, that a child's best interest is served by being raised within the family, and that the

state should not unnecessarily intrude upon, and thereby weaken, the family.

*In re Hernandez,* 249 Pa.Super. at 279–80, 376 A.2d at 651.

In the present controversy the state has already removed Cheryl Ann from Appellants' custody. Nevertheless, the loss of custody does not eradicate Appellants' legislatively protected interest in Cheryl Ann. Consistent with its declared purpose to maintain the family, the Juvenile Act permits legal custody of a dependent child to be transferred only *temporarily* from the child's natural parents to a state agency and thereby safeguards continued parental interest in the child as a preclude to the eventual reunification of the family. Sections 6301(b) and 6351(a) of the Act. "Furthermore, the rights and duties granted to a legal custodian under 42 Pa.C.S. § 6357, ... are subject to the remaining rights and duties of the parents ...." *O'Grady v. Centennial School District,* 43 Pa.Commw.Ct. 287, 293, 401 A.2d 1388, 1391 (1979). Thus, Appellants have at stake a "particularly important" private interest in Cheryl Ann that is "more substantial than mere loss of money." *Santosky.*

As for the gravity of the threatened loss to Appellants, here the state has not merely assumed legal custody of Cheryl Ann but has further attenuated familial bonds by preventing parental visitation.[2] Such a radical disruption of the familial relationship not only imposes upon Appellants a prolonged, indefinite loss[3] of a particularly important pri-

---

**2.** On March 2, 1980, the Department of Public Welfare ("DPW") adopted new regulations regarding Foster Family Care Service for Children, effective July 1, 1980, as Chapter II, Section 31 of DPW's Social Service Manual. Section 2–31–74 of the new regulations provides that the agency having custody of a child

shall direct their efforts to keeping the parent actively involved during the time of the separation of the child from his family, by [*inter alia* ] ...

—allowing parents the opportunity for regular visits with their children as a means to maintain or improve the relationship between parents and child and to prepare for family reunification. Regular visits shall be considered to be at least once every two weeks ....

**3.** Dr. Christiane Siewers, a child psychiatrist, testified on behalf of CYS that adolescence would be the proper time to reintroduce Appel-

vate interest[4] but also may well precipitate Appellants' permanent loss of parental rights through the formal dissolution of the family.[5]

Therefore, we hold, as did the trial judge,[6] that because the present state action threatens either a prolonged, indefinite or a permanent loss of a substantial private interest, the state must prove that its action was predicated upon clear and convincing evidence.[7]

Appellants next assert that the denial of parental visitation must be occasioned by clear necessity.

In the dispositional stage of a proceeding under the Juvenile Act the court may place a dependent child in the custody of the persons or agency "best suited to the protection and physical, mental, and moral welfare of the child

lants to Cheryl Ann. Pressed by the trial judge to choose a more immediate deadline for reuniting Cheryl Ann with Appellants, Dr. Siewers stated that at the age of four Cheryl Ann's verbal skills might be sufficiently well developed for her to understand and react controllably to a reunion with her natural parents.

4. Augmenting the likelihood of a permanent severing of the parent-child relationship is the tendency of the young child to form attachments with those in the child's life "whose presence has been the most continuous and stable," *i.e.,* the foster family, and the reluctance of the court to disrupt such attachments. *In re Tremayne Quame Idress R.,* 286 Pa.Super.Ct. 480, 495, 429 A.2d 40, 48 (1981).

5. Section 2–31–72 of the new regulations governing Foster Family Care Service for Children states that the "agency with custody [of the child] shall request the court to terminate parental rights when a determination has been made that it will be impossible for the child to return home within a reasonable period of time."

6. In the opinion written to support the trial judge's order of April 16, 1980, the judge states: "It is the belief of the Court ... that the evidence is clear and convincing, if not overwhelming, that continued visitation ... would create serious emotional damage to the child ...." And in the opinion written to support the trial judge's order of January 21, 1981, the judge reiterates: "[T]he Court found that the evidence was clear and convincing that the termination of visitation was necessary ...."

7. In a visitation dispute between a custodial parent and a non-custodial parent we have held that the decision of the court must rest upon clear and convincing evidence. *Lewis v. Lewis,* 271 Pa.Super.Ct. 519, 525, 414 A.2d 375, 377 (1979).

...." Section 6351 of the Act. Legislation disfavoring state interference with the family, *In re Hernandez*, and giving "deference to the parental relationship," *Ellerbe*, 490 Pa. at 369, 416 A.2d at 514, has raised a rebuttable presumption that the persons "best suited to the protection and physical, mental, and moral welfare of the child" are the child's natural parents.

■ Consequently, Section 6351 of the Act has been interpreted to require the state to demonstrate *clear necessity* for removing a child from the natural parents' custody and placing the child in the custody of a state agency. *In re Ryan Michael C.*, 294 Pa.Super.Ct. 417, 440 A.2d 535 (1982); *In re S.M.S.*, 284 Pa.Super.Ct. 9, 424 A.2d 1365 (1981); *In re K.B.; In re Pernishek*, 268 Pa.Super.Ct. 447, 408 A.2d 872 (1979). Unless the hearing court "determines that alternative services that would enable the child to remain with her family are unfeasible," *In re K.B.*, 276 Pa.Super. at 393, 419 A.2d at 515; *In re Ryan Michael C.*,[8] the court may not find clear necessity for taking the child from the natural parents' custody. "Even when there are inadequacies in the child's home, the court should first consider ordering [the state agency] to take the steps necessary to instruct the parents in the skills needed, and provide follow-up supervision in the home, where feasible." *In re Ryan Michael C.*, 294 Pa.Super. at 421, 440 A.2d at 537 (alteration in the original) (quoting *In re Whittle*, 263 Pa.Super.Ct. 312, 316, 397 A.2d 1225, 1226 (1979)).

■ In the instant case we must ascertain the proper test for allowing or disallowing visitation as part of the child's disposition under the Juvenile Act. The Act does not contain any references to visitation, and ipso facto, does not

8. Section 4–2A–11 of DPW's regulations governing Management of Social Services Delivery—Administration of County Children and Youth Social Service Programs, in effect as of January 1, 1978, states that "[s]ervices to children in their own homes is the preferred agency response .... Only when such services fail to meet the needs of children shall temporary removal be considered ...." Section 4–2A–38 of the regulations regarding Management of Social Services Delivery adds that the agency shall seek "temporary custody of all children when there are no alternatives to removal from the home ...."

offer any guidelines for granting or refusing visitation. However, because the allowance of visitation comports with the Act's express purpose of preserving the family,[9] parental visitation should be denied only under exceptional circumstances. *See Pamela J.K. v. Roger D.J.*, 277 Pa.Super.Ct. 579, 419 A.2d 1301 (1980); *Lewis v. Lewis*, 271 Pa.Super.Ct. 519, 414 A.2d 375 (1979); *Morris*, 271 Pa.Super. at 34 n. 5, 412 A.2d at 147 n. 5.

In disputes between custodial and non-custodial parents "courts rarely deny non-custodial, natural parents the opportunity to visit their children." *Spells v. Spells*, 250 Pa.Super.Ct. 168, 175, 378 A.2d 879, 883 (1977); *Lewis*. "[E]xcept in unusual circumstances the estrangement of a child from either parent will not be sanctioned ...." *Pamela J.K.*, 277 Pa.Super. at 593, 419 A.2d at 1309. "Visitation has been limited or denied only where the parent has been shown to suffer from severe mental or moral deficiencies that constitute a grave threat to the child." *Lewis*, 271 Pa.Super. at 522, 414 A.2d at 376; *Commonwealth ex rel. Peterson v. Hayes*, 252 Pa.Super.Ct. 487, 381 A.2d 1311 (1977).

■ The same concern underlies visitation controversies between custodial and non-custodial parents and those between the state and non-custodial parents, namely, the non-custodial parents' efforts to maintain contact with their natural children. Consequently, we hold, as did the trial judge, that the "grave threat to the child" standard applies to both types of visitation disputes.

■ However, mindful of the Juvenile Act's deference for parents and keenly aware of the disparity in resources between parents and the state, *see, e.g., In re S.M.S.*, we further hold that, consistent with the Act's "clear necessity" custody test, parents whose visitation is opposed by the state constitute a grave threat to their child only where

**9.** See note 2, *supra*.

there are no practicable visitation options that permit visitation and protect the child.

■ Unlike a custodial parent, the state can offer many alternatives to a parent seeking visitation. *Inter alia*, the state can provide, as it did in the instant case, counseling services and a supervised, neutral setting [10] within which parental visitation may occur.[11] Unless the state demonstrates with clear and convincing evidence that even supervised visitation would severely endanger the child, the court must deny the complete foreclosure of parental visitation as being contrary to the Act's goal of family preservation.

Finally, Appellants contend that the trial court's termination of parental visitation was not supported by competent evidence, *i.e.*, that the court's decision was not based upon clear and convincing, *competent* evidence of a grave threat to the child.

"In cases of child custody and visitation our scope of review is broad and requires independent examination of the evidence before reaching our conclusion." *Spells*, 250 Pa.Super. at 175, 378 A.2d at 883; *Pamela J.K.* "While we cannot nullify the fact-finding function of the hearing judge, we are not bound by a finding that has no *competent* evidence to support it .... In addition, we are not bound by deductions or inferences made by the lower court from the facts as found." *Miller v. Miller*, 269 Pa.Super.Ct. 83, 87–88, 409 A.2d 74, 77 (1979) (emphasis added), *allocatur denied*, December 10, 1979.

10. For twenty weeks Appellants attended the Begin Again Parent Training Program which included weekly, supervised, two-hour visits with Cheryl Ann. Thereafter, when Appellants' visits with Cheryl Ann were reduced to one, supervised hour per month, Appellants visited Cheryl Ann at CYS facilities.

11. Section 2–31–74 of the new regulations concerning Foster Family Care Service for Children states that the agency having child custody shall "provid[e] or arrang[e] a visiting site which will allow parent and child to interact in a relaxed manner. The caseworker shall attend visits when his or her presence will help the family to become reunited ...."

Five evidentiary hearings were held by the trial judge:[12] At the initial hearing on April 2, 1980, CYS caseworker Debra Kerr testified that in August of 1979 Cheryl Ann's foster mother notified CYS that after Appellants' August visit with Cheryl Ann, the child experienced severe "emotional upsetness." Consequently, CYS scheduled ex parte conferences to discuss the effect of Appellants' visitation upon Cheryl Ann.

The CYS conferences were attended by CYS caseworker Debra Kerr, Family and Children Services caseworker Martha McGinnis, staff of the Begin Again Parent Training Program, and by CYS consultants Drs. Reinhart, Goetz, and Ragins.[13] Ms. Kerr further stated that on the recommendation of Drs. Reinhart, Goetz, and Ragins, Appellants' visits with Cheryl Ann were restricted to one hour per month from September of 1979 to January of 1980, and were thereafter terminated.

On cross-examination by Appellants' attorney Ms. Kerr responded that Drs. Reinhart, Goetz, and Ragins whose professional opinions formed the basis for limiting, then eliminating, parental visitation, had neither observed nor participated in any visits between Cheryl Ann and Appellants. Speaking as a witness for CYS, Dr. Reinhart, director of the Division of Behavioral Sciences at Children's Hospital and consultant to the Begin Again Parent Training Program, explained that the foundation for his opinion on visitation was his examination of unspecified records submitted to him by CYS.

Accordingly, arguing the impossibility of meaningful cross-examination without access to said records, Appel-

12. At the hearings of April 2, 1980, and April 16, 1980, Cheryl Ann, Appellants, and CYS were represented by separate counsel. At the hearings of September 3, 1980, December 31, 1980, and January 21, 1981, Cheryl Ann, Appellants, CYS, and Cheryl Ann's foster parents (Mr. and Mrs. Brandenstein) were represented by separate counsel.

13. While it is clear from the record that neither Appellants nor any representatives on behalf of Appellants attended the CYS conferences, it is not entirely clear whether there were unnamed others in attendance.

lants' attorney objected to the use of the undisclosed records as the basis for Dr. Reinhart's opinion. On cross-examination Dr. Reinhart acknowledged that he had no direct, personal contact with either Cheryl Ann or Appellants. Asked whether "any other avenues for dealing with Cheryl [Ann's] reaction to the visits [had] been explored," Dr. Reinhart replied, "I think we have thought about other ways ...."

In contrast, Martha McGinnis, caseworker for Family and Children Services and counselor to Appellants,[14] testified that she had taken part in Appellants' supervised, one-hour November visit with Cheryl Ann at CYS facilities and had not witnessed any emotional or destructive behavior by Cheryl Ann.

Moreover, Ms. McGinnis asserted that Appellants had noticeably improved their stability, maintaining an established residence for nine months as of the hearing date. She also cited Appellants' cooperation in counseling sessions.

In concluding the April 2 hearing, the judge stated: "I am going to continue the case two weeks [until April 16, 1980]. I want you [CYS] to bring the foster mother in, and other persons who might be knowledgeable about the effects on the child of these visits. At that time we will make an order."

At the April 16, 1980, hearing Cheryl Ann's foster mother, Mrs. Brandenstein, testified for CYS that Cheryl Ann first exhibited behavioral problems after Appellants' August, 1979, visit with Cheryl Ann. Mrs. Brandenstein enumerated Cheryl Ann's problems as "diarrhea, no eye contact, anger, ... hit herself, and pulled hair out ..., was very distraught ...." From September of 1979 through

14. Ms. McGinnis outlined her counseling with Appellants as follows: It's been very difficult to try to focus on child rearing, any skills, because there isn't a child there at any of the counseling Family & Children Services has done with them. So we have been on their marriage, then on their own ability to handle anger, to handle stress, to keep their home together, not move, and keep in one place, handle their financial situation.

December of 1979 Cheryl Ann visited with Appellants at CYS for one, supervised hour per month. Following these visits, Mrs. Brandenstein stated that Cheryl Ann "showed anger and ... had some diarrhea ...." Additionally, after the January, 1980, one-hour visit with Appellants, Mrs. Brandenstein observed that Cheryl Ann "had severe diarrhea for ten or eleven days, pulled hair out" and also "rejected" her foster family.

Also appearing for CYS, Trudi Fricenda, coordinator of the Begin Again Parent Training Program, explained that Appellants had participated in two ten-week parent education programs during which Appellants had weekly, supervised, two-hour visits with Cheryl Ann. Ms. Fricenda commented that between the first and second education programs Appellants showed progress in parenting skills "in terms of picking up [Cheryl Ann's] shoes, in terms of sharing of the parental tasks at hand." In addition, Ms. Fricenda reported having had telephone conversations with Mrs. Brandenstein from the period August 3, 1979, through October 3, 1979, wherein Mrs. Brandenstein stated that Cheryl Ann was having severe reactions to Appellants' visits. However, asked whether Appellants' visits with Cheryl Ann should be continued or discontinued, Ms. Fricenda declined to offer an opinion because she had not been "involved with the Rhines" and lacked "direct experience."

Finally, Martha McGinnis of Family and Children Services again opined on Appellants' behalf that limited visits of one, supervised hour per month would not endanger Cheryl Ann and would enable Appellants to form a relationship with their child.

At the close of the hearing the judge ordered the case continued until September 3, 1980, to allow CYS to have Cheryl Ann evaluated and to permit Cheryl Ann to "stabilize, develop, and get those strengths necessary to deal with these kinds of separations and problems." In effect, the judge's order sanctioned the termination of visitation unilaterally imposed by CYS in January of 1980 and perpetuated

the visitation hiatus for a period exceeding eight months, thus prompting the instant appeal to this Court.

Having ruled that this case concerns an important, legislatively protected, private interest, we have also held that the state must adduce clear and convincing evidence of a clear necessity for indefinitely restricting or entirely terminating Appellants' interest in Cheryl Ann. Regarding the quality of evidence admissible at a dispositional hearing under the Juvenile Act, Section 6341(d) of the Act states that "all evidence helpful in determining the questions presented, including oral and written reports, may be received by the court and relied upon to the extent of its probative value even though not otherwise competent in the hearing on ... [dependency]." Although a relaxation of evidentiary rules is thus permitted during dispositions, the Act does not authorize dispositions in total disregard of evidentiary precepts. For example, Section 6341(d) provides that where written reports are received, "[t]he parties or their counsel shall be afforded an opportunity to examine and controvert [said] ... reports ... and to cross-examine individuals making the reports."

In the present case CYS caseworker Debra Kerr maintained that CYS ended Appellants' visitation on the advice of CYS consultants. Testifying for the CYS consultants, Dr. Reinhart admitted that he had met neither Cheryl Ann nor Appellants and that Cheryl Ann had not been tested. Dr. Reinhart further stated that his opinion was based upon written reports which he had not prepared and which were not offered into evidence. Therefore, Appellants' attorney was effectively precluded from examining and controverting the reports and from cross-examining the persons who compiled the reports.

The sole firsthand witness to Cheryl Ann's behavioral problems was Mrs. Brandenstein, the foster mother. While Mrs. Brandenstein had direct knowledge of Cheryl Ann's behavior and was available for cross-examination by Appellants' counsel, Mrs. Brandenstein was not qualified as an expert to testify as to the cause of Cheryl Ann's conduct

which was, in fact, the underlying issue of the visitation hearings. Moreover, Mrs. Brandenstein was not a disinterested witness to the proceedings. At a hearing on December 31, 1980, Mrs. Brandenstein testified that she and her husband wanted to adopt Cheryl Ann. *See generally Smith v. Organization of Foster Families for Equality and Reform*, 431 U.S. 816, 97 S.Ct. 2094, 53 L.Ed.2d 14 (1977).

The only other witness who testified from actual experience with Cheryl Ann was Martha McGinnis of Family and Children Services. As a family counselor to Appellants, Ms. McGinnis stated that Appellants had progressed toward stabilization of their home life and that Appellants and Cheryl Ann had interacted appropriately during a supervised, one-hour November visit which Ms. McGinnis attended. Ms. McGinnis added that she did not observe any behavioral problems on the part of Cheryl Ann at the November visit.

Accordingly, we hold that as of the hearing of April 16, 1980, the trial court did not have before it competent evidence to terminate parental visitation. To hold otherwise would permit a finding of clear and convincing evidence where competent evidence is lacking. Such a complete disregard of evidentiary rules would subvert the clear necessity test and circumvent the Act's protection of the strong parental interest in a natural child.

At the hearing on September 3, 1980, CYS caseworker Debra Lear asserted the Appellants had relocated to a new apartment in July of 1980 and that she had interviewed Appellants in their new home twice during the month of August. Ms. Lear reported that during the second August meeting Appellants told her that Appellant Richard Rhine occasionally suffered from violent, epileptic seizures.

Appellant Richard Rhine testified that his seizures were being treated by medication prescribed by his doctor and that, to the best of his knowledge, he had suffered a nonviolent seizure in July of 1980. On direct examination Appellant Cheryl Rhine stated that during her three-year

marriage with Appellant Richard Rhine she had never seen her husband experiencing a violent seizure. On cross-examination, however, Appellant Cheryl Rhine admitted that in July of 1980 her husband had suffered a violent seizure.

The principal witness at the September hearing was Vivian T. Harway, Ph.D., a clinical psychologist and director of Consultation and Education for the Pittsburgh Child Guidance Center. Dr. Harway explained that in addition to reviewing records from Children's Hospital, the Parental Stress Center, and CYS consultants Drs. Reinhart and Goetz, she spent two and one-half hours with Cheryl Ann and her foster parents. Cheryl Ann, then 26 months old, was given the Stanford-Binet intelligence test. Based upon her personal evaluation of Cheryl Ann, Dr. Harway concluded that Cheryl Ann was currently unable to deal properly with separations and probably would remain cognitively unable to handle separations until the age of seven or eight. Nevertheless, on direct examination Dr. Harway opined that

> there would be no harm in controlled supervised visits [of one hour per month] .... I think it would be better if there were controlled visits with the parents learning how to cope with it. There will be consequences of the visits, but if the foster parents are helped to cope with the consequences, it would be the same thing as [Cheryl Ann's] going to a preschool or being left with a sitter or all other things which will be separation experiences. [Cheryl Ann] has to learn to cope with this. She is now at the point that she is demanding exclusivity. She has to learn reality doesn't give anybody exclusivity over anyone else.

On cross-examination Dr. Harway admitted that she had never met Appellants. Consequently, Dr. Harway's evaluations of Cheryl Ann's adverse reaction to separations concerned Cheryl Ann's reactions to the presence or absence of her foster parents, not the presence or absence of her natural parents, *i.e.*, Appellants. When asked by Appellants' counsel whether Cheryl Ann's "conduct, the anxiety and tension," resulted from "contact with the natural par-

ents, or merely the [confusing presence of] ... another figure [foster parents]," Dr. Harway evaded the question and responded, "Whatever I think, this child does not view the natural parents as primary attachment figures ...."

In concluding the hearing the trial judge continued the case to December 31, 1980, so that both Appellants could receive mental health evaluations and Appellant Richard Rhine could obtain a complete medical examination. Additionally, Cheryl Ann's foster parents were instructed to participate in a parenting program. The judge explained that the continuation was "to give every opportunity possible, and have as much done to determine whether visitation is appropriate." Despite the judge's expressed concern for Appellants' interest in visiting Cheryl Ann, the effect of the judge's action was to prolong the suspension of parental visitation for a period totalling more than eleven months from the initial CYS termination of visitation.

Although the judge continued the case from September 3, 1980, to December 31, 1980, CYS caseworker Debra Lear began the December hearing by requesting a continuance so that CYS could produce a witness, Dr. Siewers, who had conducted therapy sessions with Cheryl Ann and her foster family. Protesting the requested continuance, Appellants' attorney countered that CYS had ample notice of the December hearing and thus had an adequate opportunity to obtain its witness. Furthermore, Appellants' attorney stated that Dr. Siewers' testimony was not material to the issue of Appellants' visitation with Cheryl Ann since Dr. Siewers had only worked with Cheryl Ann and the foster family and had never met Appellants or evaluated their interaction with Cheryl Ann.

At the December hearing Mrs. Brandenstein, Cheryl Ann's foster mother, testified that since Cheryl Ann and the foster family had attended therapy sessions, Cheryl Ann was "much more pleasant." Nonetheless, Mrs. Brandenstein confessed that the foster family "had a lot of difficulty when [Cheryl Ann was being] toilet trained ... because her behavior ... seemed abnormal." Asked to depict Che-

ryl Ann's behavior at that time, Mrs. Brandenstein replied, "Anger and distress. I guess it was resistance of change .... She didn't eat well. She couldn't sit at the table. She went back to her habits that she had experienced before when she was in distress .... Inability to sit at the table, screaming, getting up at night." These behavioral problems occurred months after Cheryl Ann's last contact with Appellants, and no attempt was made to connect Cheryl Ann's conduct in this context to the presence or absence of Appellants.

Questioned by the judge as to whether she thought Cheryl Ann could tolerate resumed parental visitation, Mrs. Bradenstein responded in the affirmative, adding that Cheryl Ann was "doing much better with strangers."

Family and Children Services caseworker Martha McGinnis explained to the court that Appellants had moved to improved accommodations in a housing project which also afforded an opportunity for Appellants to interact with the children of other families living in the housing development. Specifically, Ms. McGinnis stated that Appellants "have friends that have children all age levels, a new baby, which Cheryl [Appellant—natural mother] does babysitting for quite often ...." Additionally, Ms. McGinnis discussed several kinds of counseling groups in which Appellants, particularly the natural mother, participated.

The case was continued to January 21, 1981, to allow Dr. Siewers to testify on behalf of CYS.

Appearing as the only witness at the January 21, 1981, hearing was Christiane Siewers, M.D., a pediatrician and child psychiatrist, who evaluated Cheryl Ann on the basis of two interviews. The first interview occurred in December of 1980 and was attended by Cheryl Ann and Mrs. Brandenstein. The second interview occurred in January of 1981 and was attended by Cheryl Ann and the entire foster family. Dr. Siewers stated that Cheryl Ann related very well to all members of the foster family.

Asked whether she had spoken with Cheryl Ann about her natural parents, Dr. Siewers replied that Cheryl Ann's verbal skills, while "age appropriate," were too underdeveloped for that type of conversation. Consequently, Dr. Siewers maintained that she could not evaluate Cheryl Ann's feelings toward Appellants.

Despite never having met Appellants and never having observed or discussed Cheryl Ann's reaction to Appellants, Dr. Siewers offered a "recommendation as to the possibility of reinstituting visitation" between Cheryl Ann and Appellants. Dr. Siewers opined that

looking at Cheryl [Ann] and ... looking at the record, ... [there was] not really ... any advantage for Cheryl [Ann], herself—for visiting with her [natural] parents.

....

Again, I have to go back to the records. What I know is not firsthand, but from what I read there, there were just severe emotional upsets over separations or having seen the natural parents ....

Requested to suggest a suitable time for resuming parental visitation, Dr. Siewers answered that Cheryl Ann would probably benefit from contact with Appellants when she reached adolescence.

Noting the severity of Dr. Siewers' recommendation, the trial judge explained that

the law is going in one of two directions; either you rehabilitate the family and make it possible to have this child back, quickly, or you take the other very drastic step and terminate parental rights .... I think we're, almost, obligated to make some attempt, if the child is, apparently, strong enough to—not being totally destroyed by attempted visitation. Time is important.

Accordingly, Dr. Siewers recanted and suggested that visitation could be resumed when Cheryl Ann acquired enough verbal skills to handle the reunion, at approximately four years of age. Furthermore, Dr. Siewers acknowledged the court's concern over Cheryl Ann's increasing "psycho-

logical identification ... with the foster mother ... [as] the separation [from Appellants] becomes virtually permanent." Dr. Siewers reasoned,

> That's the thing ... that we're dealing with. We can't have the child be totally alienated from the natural parents, by having no contact, at all, while trying to get the child to a point where we [*sic*—she] can handle it.

> ... If the goal is to reacquaint her with her parents, which I don't know that that would be my goal, because I don't know that it's in her best interest ...,[15] I would think, as soon as possible, for her to see her natural parents ....

At the end of Dr. Siewers' testimony the judge concluded the hearing by stating, "[W]e'll continue the termination of the visitation. I don't see that we should come back here in any given time, ... but I would suggest that it, probably, wouldn't make sense to have a review of this case in less than a year ...." This decision of the court of common pleas prompted a second appeal by the natural parents.

Having ruled that the evidence accumulated as of the April 16, 1980, hearing did not satisfy the evidentiary standard for suspending parental visitation, we now consider whether the additional evidence adduced at the hearings of September 3, 1980, December 31, 1980, and January 21, 1981, was clear and convincing evidence of a clear necessity to terminate visitation.

Drs. Harway and Siewers testified that they had reviewed records of Cheryl Ann's behavioral history. The records were not submitted into evidence, and thus Appellants' counsel did not have an adequate opportunity for cross-examination on the substance of the undisclosed records. See Section 6341(d) of the Juvenile Act. Unlike Dr. Reinhart, however, both Dr. Harway and Dr. Siewers had personal contact with Cheryl Ann. Dr. Harway spent

---

**15.** As previously explained, under the Juvenile Act there is a presumption that a child's best interests are served by allowing the child to be raised in the natural family. The state bears the onus of overcoming this presumption.

two and one-half hours with Cheryl Ann and her foster parents. Dr. Siewers conducted two interviews with Cheryl Ann, one involving the foster mother and one involving the entire foster family.

Both doctors agreed that Cheryl Ann could not deal with separations. Stating that Cheryl Ann should be desensitized to separations by exposure to preschool and baby-sitters, Dr. Harway asserted that "there would be no harm in controlled supervised visits [of one hour per month]" between Cheryl Ann and Appellants if the foster parents dealt properly with the visits. Dr. Siewers affirmed the need for contact between Cheryl Ann and Appellants if the purpose of the court proceedings was to reunite the natural family at a future date.

Neither doctor interviewed Appellants or observed Cheryl Ann interact with Appellants. Nor did either doctor cite any action or inaction by Appellants as the cause of Cheryl Ann's behavioral difficulties. On cross-examination Dr. Harway was asked whether Cheryl Ann's inappropriate conduct was caused by contact with Appellants or by the existence of two sets of parents (the natural parents and the foster parents). This question presented the central issue of the case, i.e., whether or not Appellants constitute a grave threat to Cheryl Ann and whether there is a visitation format which will protect both Cheryl Ann's well-being and Appellants' interest in establishing and maintaining a relationship with their child. However, Dr. Harway failed to answer the question posed.

Cheryl Ann's foster mother, Mrs. Brandenstein, testified that since entering therapy Cheryl Ann was more easily handled. But Mrs. Brandenstein recounted severe behavioral problems on the part of Cheryl Ann when the foster family attempted to toilet-train the child. There was no attempt to relate Cheryl Ann's difficult conduct to Appellants as, in fact, Appellants had been prevented from visiting Cheryl Ann for several months before this behavior occurred. Mrs. Brandenstein declared that in her opinion

Cheryl Ann could resume visits with her natural parents since her reactions to strangers had improved.

Family and Children Services caseworker Martha McGinnis explained that Appellants were leading a more stabilized home life and had increased associations with children of various ages who lived in the vicinity of their new residence. Ms. McGinnis cited Appellant Cheryl Rhine's participation in several counseling programs and her frequent baby-sitting for a neighborhood child.

With respect to Appellant Richard Rhine's health disorder, no conclusive evidence was offered to prove that during a *supervised* visit Cheryl Ann would be endangered by Appellant's epileptic seizures. There was no evidence of Appellant's having suffered a seizure or having harmed Cheryl Ann during any of Appellant's visits with Cheryl Ann. Appellant stated that he was under a physician's care and was taking medicine to control the epilepsy.

■ This protracted case presented many difficulties. The trial judge throughout showed great concern about, and sensitivity toward, the welfare of Cheryl Ann. However, we find that the aggregate evidence attained through the five delineated hearings does not rise to the level of clear and convincing, *competent* evidence of a grave threat to Cheryl Ann.[16]

Accordingly, we reverse the aforementioned orders of the Court of Common Pleas of Allegheny County which terminated parental visitation. Relinquishing jurisdiction in this

---

**16.** Faced with the monumental task of analyzing the evidence in this case, the trial judge admirably summarized the facts in both of his opinions. However, in the interest of accuracy one statement in the court's second opinion must be modified. The opinion states that "[i]n playing with a puppet in the second interview [with Dr. Siewers], Cheryl [Ann] became very frightened when the doctor used the same puppet telling her that it was her mother." The transcript of Dr. Siewers' courtroom testimony states: "In the second interview, when I saw [Cheryl Ann], there was one period where she got very frightened, when I used that same puppet .... When I showed her that puppet, while her [foster] mother was busy doing something else, Cheryl got very frightened and drew into herself ...." Dr. Siewers never indicated that Cheryl Ann thought, or was told to imagine, that the puppet represented either her natural mother or her foster mother.

matter, we remand this case to said court for further proceedings consistent with this opinion.

WICKERSHAM, J., concurs in result.

WIEAND, J., files a concurring and dissenting opinion.

WIEAND, Judge, concurring and dissenting:

I concur in the majority's decision to remand for further proceedings. However, I do so because the lapse of time commands that another hearing be held and not because I find error in the trial court's determination of January 21, 1981.

The court's order of April 16, 1980 is moot. This order denied to appellants the right of visitation with their child, who had been previously adjudicated dependent, until September 3, 1980. That date has now passed, and the court's order has been superseded by an order of January 21, 1981. This later order, entered after three separate hearings, deferred future visitations until further order of the court. The later order is properly the subject of appellate review; but no good purpose can be served by reviewing and/or reversing the earlier order.

The "clear and convincing evidence" standard of proof has been imposed by the Supreme Court of the United States upon proceedings to terminate rights of parents to their natural children. *Santosky v. Kramer*, 455 U.S. 745, 102 S.Ct. 1388, 71 L.Ed.2d 599 (1982). The standard for adjudicating a child dependent is also "clear and convincing evidence." 42 Pa.C.S. § 6341(c). Moreover, even after a child has been adjudicated dependent, he or she may not be removed from the custody of his or her parents except in cases of "clear necessity." *In the Interest of Ryan Michael C.*, 294 Pa.Super. 417, 421, 440 A.2d 535, 536 (1982); *In the Interest of Pernishek*, 268 Pa.Super. 447, 457, 408 A.2d 872, 877 (1979). However, once the child has been adjudged dependent and taken from the parents, issues of custody and visitation must be determined according to the child's best interests. *In re Bennage*, 303 Pa.Super. 318,

320, 449 A.2d 707, 708 (1982); *Stapleton et al. v. Dauphin County Child Care Service et al.*, 228 Pa.Super. 371, 391, 324 A.2d 562, 572 (1974). Nevertheless, a parent is rarely denied the right to visit his or her child. *In re: the Matter of Lisa and Cynthia*, 287 Pa.Super. 255, 259, 429 A.2d 1197, 1199 (1981); *Lewis v. Lewis*, 271 Pa.Super. 519, 522, 414 A.2d 375, 376 (1979), *cert. denied*, 449 U.S. 877, 101 S.Ct. 221, 66 L.Ed.2d 99 (1980); *Commonwealth ex rel. Peterson v. Hayes*, 252 Pa.Super. 487, 490, 381 A.2d 1311, 1312 (1977) (plurality opinion); *Fernald v. Fernald*, 224 Pa.Super. 93, 95, 302 A.2d 470, 471 (1973). Generally, visitation will be denied or limited only where there are severe mental or moral deficiencies of the parent which are shown to be gravely detrimental to the welfare of the child. *In re: the Matter of Lisa and Cynthia*, *supra*, 287 Pa.Super. at 260, 429 A.2d at 1199; *Lewis v. Lewis*, *supra*; *Commonwealth ex rel. Sorace v. Sorace*, 236 Pa.Super. 42, 44, 344 A.2d 553, 554 (1975); *Commonwealth ex rel. Peterson v. Hayes*, *supra*.

I am unable to agree with the writer of the lead opinion that the record discloses a lack of competent evidence to support the hearing court's determination that immediate visitations would have been gravely detrimental to the child. There clearly was competent evidence to support such a finding. The credibility and weight of that evidence were for the trier of the facts. I would accept the finding of the hearing judge, who saw and heard the witnesses and concluded that "the child would be in serious emotional and physical danger in the custody of the parents, and even visitation at this time would be seriously detrimental to the child."

Were it not for the fact that nearly two years have passed since the order which deferred the parents' right to visit their child was entered, I would simply affirm the hearing court's order. However, the passage of time suggests most strongly that additional evidence is now required and that appellants' asserted rights of visitation be recon-

sidered in the light of such additional evidence. I would remand for that purpose only.