J-A20029-15

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | |
|---|---|
| IN THE INTEREST OF: L.J., A MINOR, | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| APPEAL OF: J.J., MOTHER, | |
| Appellant | No. 3161 EDA 2014 |

Appeal from the Order Entered October 20, 2014
In the Court of Common Pleas of Philadelphia County
Family Court at No(s): 51-FN-337013-2009, CP-51-DP-0000731-2014

| | |
|---|---|
| IN THE INTEREST OF: E.J., A MINOR, | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| APPEAL OF: J.J., MOTHER, | |
| Appellant | No. 3162 EDA 2014 |

Appeal from the Order Entered October 20, 2014
In the Court of Common Pleas of Philadelphia County
Family Court at No(s): 51-FN-337013-2009, CP-51-DP-0000732-2014

| | |
|---|---|
| IN THE INTEREST OF: J.J., A MINOR, | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| APPEAL OF: J.J., MOTHER, | |
| Appellant | No. 3163 EDA 2014 |

Appeal from the Order Entered October 20, 2014
In the Court of Common Pleas of Philadelphia County
Family Court at No(s): 51-FN-337013-2009, CP-51-DP-0000733-2014

BEFORE:  DONOHUE, SHOGAN, and WECHT, JJ.

MEMORANDUM BY SHOGAN, J.:**FILED AUGUST 26, 2015**

Paternal Grandmother, J.J., is the adoptive mother ("Mother") of L.J., born in April of 2004, and his twin brothers, E.J. and J.J., born in October of 2005 (collectively, the "Children").  Mother appeals the order ceasing reunification efforts and suspending visitation based on the juvenile court's finding of aggravated circumstances.  We affirm.

The Department of Human Services ("DHS") received a Child Protective Services ("CPS") report on December 17, 2013, alleging that a household member had beaten E.J. the previous day.  The matter was referred to the Department of Public Welfare ("DPW") for an investigation due to the conflict of interest arising from Mother's receipt of an adoption subsidy from DHS.  DPW social workers interviewed the Children and Mother on December 18, 2013.  The social workers learned that T.M. ("Aunt") had whipped E.J. with a belt approximately twenty times at Mother's direction, resulting in injuries to E.J.  Additionally, DPW confirmed that a report of abuse regarding L.J. had been indicated on June 17, 2013.  Although DHS and DPW instructed Mother to take the Children for medical attention on December 18, 2013, she did not comply until December 20, 2013, when the

Children saw their family physician, Dr. Claudia Ferran. Dr. Ferran reported injuries to E.J. and L.J. consistent with abuse.[1]

Based on its investigation, DPW indicated the December 17, 2013 CPS report for abuse against Aunt and against Mother as a perpetrator by omission. Although the Children were permitted to remain in Mother's home, DPW instituted a safety plan for the Children that precluded anyone from using physical discipline on the Children. However, while visiting the Children on March 24, 2014, DPW supervisor, Alexander Prattis, Jr., heard from E.J. that Mother had beaten him again, causing an injury to his groin. Based on Mother's alleged violation of the safety plan, DHS filed a CPS report, obtained an order of protective custody for the Children, and placed them in foster care at the Presbyterian Children's Village.

Dr. Stephanie Deutsch, a Child Abuse Specialist, evaluated the Children on April 3, 2014. Dr. Deutsch opined that, as a result of the abuse to E.J., he suffered permanent scars, impaired functioning, and significant stress-related behavioral issues. Regarding J.J. and L.J., Dr. Deutsch opined that all of their injuries were consistent with non-accidental trauma and child abuse.

---

[1] Dr. Ferran's report stated as follows: "Physical abuse-[E.J.] and his brothers were whipped-E.J. with extensive markings-with loop marks and abrasions on chest, back, arms and legs. Please see pictures. The markings are consistent with forceful whipping with a belt causing bruising and skin breadown." Child Advocate Exhibit 2, E.J. Progress Notes at 2.

The juvenile court conducted an adjudicatory hearing on May 1, 2014. Based on the evidence received, the juvenile court adjudicated the Children dependent, made a finding that Mother was a perpetrator of abuse by omission,[2] continued the Children's placement in foster care, and continued the supervised visits until therapeutic visits could begin.

As advocate for the Children, the Defender Association of Philadelphia ("Child Advocate") filed a motion for a finding of aggravating circumstances under 42 Pa.C.S. § 6302 on August 1, 2014. The juvenile court conducted a hearing on October 20, 2014. After receiving testimonial, documentary, and photographic evidence, the juvenile court found aggravating circumstances, determined that efforts to reunify the family were not necessary, continued the Children's placement in foster care, and discontinued Mother's visitation. N.T., 10/20/14, at 90–92. Mother filed this appeal; she and the juvenile court complied with Pa.R.A.P. 1925. Mother presents the following questions for our consideration:

1. Did the trial court abuse its discretion and commit legal error under 42 Pa.C.S. § 6303, given that [Child Advocate] failed to prove by clear and convincing evidence that the child or another child of Mother was the victim of physical abuse resulting in serious bodily injury or aggravated physical neglect?

---

[2] As of the May 1, 2014 hearing, the March 26, 2014 CPS report regarding the alleged injury to E.J.'s groin was still under investigation. N.T., 5/1/14, at 28, 39, 42. At the October 20, 2014 hearing, Mother's counsel indicated that the March 2014 CPS report was unfounded. N.T., 10/20/14, at 83.

2. Did the trial court abuse its discretion and commit legal error in its suspension of visitation between the child and Mother, given that [Child Advocate] presented insufficient evidence to demonstrate that visitation would pose a grave threat to the child?

Mother's Brief at 4.

Initially, we note that Mother did not appeal the adjudication of dependency. Currently, she appeals the juvenile court's finding of aggravating circumstances and the suspension of visitation. We are mindful that the Juvenile Act, 42 Pa.C.S. §§ 6301–6365 ("the Act"), which was amended in 1998 to conform to the federal Adoption and Safe Families Act ("ASFA"), 42 U.S.C. §§ 671-679c, controls the adjudication and disposition of dependent children. *In re R.P.*, 957 A.2d 1205, 1217 (Pa. Super. 2008). "The policy underlying these statutes aims at the prevention of children languishing indefinitely in foster care, with its inherent lack of permanency, normalcy, and long-term parental commitment." *Id.* at 1218. Furthermore, the 1998 amendments to the Act, as required by ASFA, place the focus of dependency proceedings on the child. Safety, permanency, and the well-being of the child must take precedence over all other considerations, including the rights of the parents. *Id.* Moreover:

> [w]e accord great weight to [the fact-finding] function of the hearing judge because he is in the position to observe and rule upon the credibility of the witnesses and the parties who appear before him. Relying upon his unique posture, we will not overrule his findings if they are supported by competent evidence.

> *In re B.B.*, 745 A.2d 620, 622 (Pa. Super. 1999) (citations omitted). "Although bound by the facts, we are not bound by the trial court's inferences, deductions, and conclusions therefrom; we must exercise our independent judgment in reviewing the court's determination, as opposed to its findings of fact, and must order whatever right and justice dictate." *In re C.J.*, 729 A.2d 89, 92 (Pa. Super. 1999) (citing *In re Donna W.*, 325 Pa.Super. 39, 472 A.2d 635 (1984) (*en banc*)).

*In re D.A.*, 801 A.2d 614, 618 (Pa. Super. 2002).

Here, Child Advocate averred, and the juvenile court found, the existence of aggravated circumstances under 42 Pa.C.S. § 6302, thereby allowing the juvenile court to suspend efforts at reunification. That section provides, in relevant part, as follows:

> **Aggravated circumstances.** Any of the following circumstances:
>
> * * *
>
> (2) The child or another child of the parent has been the victim of physical abuse resulting in serious bodily injury, sexual violence or aggravated physical neglect by the parent.

42 Pa.C.S. § 6302(2). "If the court finds from clear and convincing evidence that aggravated circumstances exist, the court shall determine whether or not reasonable efforts to prevent or eliminate the need for removing the child from the home or to preserve and reunify the family shall be made or continue to be made and schedule a hearing." 42 Pa.C.S. § 6341(c.1); *In the Matter of A.H.*, 763 A.2d 873, 878 (Pa. Super. 2000). "Clear and convincing" evidence has been defined as testimony that is "so clear, direct, weighty, and convincing as to enable the trier of facts to come to a clear

conviction, without hesitancy, of the truth of the precise facts in issue." *In re A.B.*, 63 A.3d 345, 349 (Pa. Super. 2013) (quoting *In re C.R.S.*, 696 A.2d 840, 843 (Pa. Super. 1997) (citation omitted)).

Mother first argues that the juvenile court used a lower standard than what is mandated by the Act to conclude that the Children suffered serious bodily injury. Mother's Brief at 18. According to Mother, the evidence failed to establish that the Children were victims of physical abuse resulting in serious bodily injury or aggravated physical neglect. *Id.* Mother identifies serious bodily injury as consisting of multiple bone fractures or developmental delays. *Id.* at 19–20. Mother submits that courts are particularly concerned about evidence of old fractures and attempts by parents to conceal the abuse. *Id.* at 20 (distinguishing *In the Matter of A.H.*, 763 A.2d 873 (Pa. Super. 2000), and *In re R.P.*, 957 A.2d 1205 (Pa. Super. 2008)). Mother asserts that, because the Children at issue suffered injuries far less severe, Child Advocate failed to meet its burden that there was clear and convincing evidence of serious bodily injury to the Children. *Id.* at 21. Additionally, Mother contends, given Dr. Deutsch's testimony that scars fade, Child Advocate "failed to prove by clear and convincing evidence that the injuries suffered by the [C]hildren resulted in serious, permanent disfigurement." *Id.* at 22. Finally, Mother argues, "There is no evidence in the record that any of the [C]hildren suffered a condition that seriously impaired their functioning. . . . Speculation by [Dr. Deutsch] does not

amount to clear and convincing evidence of an injury covered by 42 Pa.C.S. § 6302." *Id.* at 23. Therefore, Mother concludes, Child Advocate "failed to prove by clear and convincing evidence that the injuries suffered by the [C]hildren were the result of aggravated physical neglect." *Id.*

As used in the statute, serious bodily injury means "bodily injury which creates a substantial risk of death or which causes serious, permanent disfigurement or protracted loss or impairment of the function of any bodily member or organ." 42 Pa.C.S. § 6302. Aggravated physical neglect is "[a]ny omission in the care of a child which results in a life-threatening condition or seriously impairs the child's functioning." *Id.*

Here, the juvenile court supported its finding of aggravated circumstances with the following rationale:

> Expert testimony provided by Dr. Deutsch established that the Children's injuries were non-accidental injuries which resulted in serious bodily injury. (N.T. 10/20/14, pgs. 55, 57). Dr. Deutsch testified that the scarring the Children had was significant and permanent. (N.T. 10/20/14, pgs. 29, 34). Dr. Deutsch also testified that the injuries the Children sustained rises [sic] to the level of child abuse and Dr. Deutsch diagnosed the Children's injuries as "non-accidental trauma". (N.T. 10/20/14, pg. 35). Dr. Deutsch testified that during her physical examination of [E.J.], she saw scarring on [E.J's] anterior and posterior chest, and abrasions and scars to his bilateral thighs that were consistent with the marks a loop from a belt would leave. (N.T. 10/20/14, pg. 29). Dr. Deutsch testified during the abuse investigation, [E.J.] disclosed that his leg did hurt him and due to the pain, he had to limp. (N.T. 10/20/14, pg. 35). Dr. Deutsch asked [E.J.] whether he experienced pain as a result of the injuries inflicted by Mother and he responded that he did. (N.T. 10/20/14, pg. 27). Mother, as the sole caregiver, was responsible for [the C]hildren's care. Mother admitted that the beating of [E.J.] and [L.J.] in December 2013 was at her

direction, she was in the house when the abuse took place and she did not try to stop it. (N.T. 5/01/14, pg. 24). Mother stated that she realized the beating was severe when she heard [E.J.] yelling but she never went to check on [E.J.] either during or after the beating. (N.T. 5/01/14, pgs. 24, 35). [The] Children were regularly physically disciplined in Mother's home. (N.T. 5/01/14, pgs. 16, 21–24). All three Children identified Mother as the perpetrator of the injuries they sustained. (N.T. 10/20/14, pg. 56). A review of the record establishes the seriousness and non-accidental character of the Children's injuries. (N.T. 5/01/14, pgs. 19, 20, 25, 26, 35, 43). A finding of aggravated circumstances is supported under current law. Mother was responsible for caring for the Children and for the Children's welfare. Mother's failure to adequately protect [the] Children resulted in [the] Children suffering serious bodily injuries and permanent disfigurement.

The record reflects that [the] Children suffered serious bodily injury that was non-accidental, caused [the] Children severe pain, and impaired Children's functioning. Child Advocate and DHS presented clear and convincing evidence to warrant a finding of aggravated circumstances. The testimony of the DHS witnesses and the expert, Dr. Deutsch, was credible. The trial court did not abuse its discretion in ordering for DHS to cease reasonable efforts to reunify [C]hildren with Mother. The health and safety of the Children supersede all other considerations. It is well within [the juvenile court's] discretion to order cessation of reunification services. The abuse by the Mother precludes the necessity of reasonable reunification efforts.

Juvenile Court Opinion, at 3/3/15, at 4–5.

Upon review, we conclude that the testimonial, documentary, and

photographic evidence[3] supports the juvenile court's finding that Mother

---

[3] The Child Advocate proffered colored photographs bearing witness to the Children's physical injuries. For example, one photograph depicted an "acute wound with scabbing" on E.J.'s chest as a result of the December 16, 2013 whipping. As of Dr. Deutsch's April 3, 2014 exam, the wound was a scar. Child Advocate Exhibit 5 at 170, 182; Child Advocate Exhibit 2 at 176.

disciplined the Children—or instructed a family member to discipline them—with a belt or wire. N.T., 5/1/14, at 9, 11, 14–16, 20–27, 33–34, 37, 43, 47–49, 71–72; N.T., 10/20/14, at 24–26, 29, 31–34, 40, 44–52, 55–57. The evidence indicates that the December 16, 2013 whipping was painful and that E.J. was uncomfortable sitting down, and he presented at school with a limp. N.T., 5/1/14, at 14–15, 17–18; N.T., 10/20/14, at 21, 27, 35–36, 64. Mr. Prattis testified to old injuries that he observed on each of the Children and to an open wound on J.J.'s left leg several days after the December 16, 2013 whipping. N.T., 5/1/14, at 25–26, 43.

Additionally, expert medical testimony, which the juvenile court found credible, substantiates that, as a result of Mother's actions and omissions, the Children suffer from permanent disfigurement in the form of scarring on their bodies, as well as emotional trauma. N.T., 10/20/14, at 29, 31–36, 44–47, 53–57, 63–64, 91; Child Advocate Photographs 170, 175, 176, 177, 178, 179, 180, 181, 182. Regarding E.J. specifically, as a result of the December 16, 2013 abuse, his ambulation was impaired, and he would have experienced difficulty sleeping and showering. *Id.* at 35, 64. Moreover, E.J. and J.J. made suicidal gestures and demonstrated significant behavioral issues. N.T., 5/1/14, at 53–55; N.T., 10/20/14, at 39. At the time of the hearing, J.J. was enrolled in a partial therapy program and E.J. was hospitalized for therapeutic services. N.T., 5/1/14, at 53–55. The Children were recommended for trauma therapy. *Id.* at 37–38, 49, 53–56, 60. Until

removed from Mother's care, the Children also experienced enuresis (involuntary urinating). N.T., 5/1/14, at 60. The DHS social worker believed the Children would not be safe if returned to Mother. *Id.* at 64.

A most disturbing facet of this case is Mother's education and employment background. Mother holds a master's degree in social work and has fifteen years of experience in the child welfare program, as well as ongoing training in that field as a foster parent and as an adoptive parent. N.T., 5/1/14, at 29–32; N.T., 10/20/14, 78–79, 91–92. Despite her training not to use physical discipline,[4] Mother confirmed that she would "spank" the Children with a belt. N.T., 5/1/14, at 71–72. Mother showed no interest in the Children's injuries, no remorse for beating the Children or instructing Aunt to beat them, and she would justify the reports of injuries; indeed, she did not intervene in the December 16, 2013 beating until E.J. had been whipped twenty times, and she refused to seek medical treatment for him. *Id.* at 23–24, 33–36, 74, 77–78. Moreover, the Children's school filed "at least four additional previous [reports] of child abuse in regards to this family," and Mother ignored requests from the Children's school to provide them with evaluations and counseling despite E.J. and J.J. being in crises. *Id.* at 37–38, 49. Of great concern is Mother's admission that she would

---

[4] Mr. Prattis testified that "foster parents cannot physically discipline the children whatsoever." N.T., 5/1/14, at 29. Also, Mother "would actually have been the one who was trained to teach the foster parents and to make sure that they are not physically disciplining the children." *Id.* at 31.

continue to use physical discipline on the Children and "beat their asses" if their behavior is inappropriate. *Id.* at 39, 47, 60–61, 64. Based on the evidence of record, we discern no abuse of the juvenile court's discretion or error of law. Child Advocate presented clear, direct, weighty, and convincing evidence to enable the juvenile court to come to a clear conviction, without hesitancy, that aggravating circumstances existed. *In re A.B.*, 63 A.3d at 349. Thus, we affirm its finding of aggravating circumstances and the cessation of reasonable efforts toward reunification.

Mother's second issue challenges the juvenile court's suspension of visitation between the Children and Mother because Child Advocate failed to present sufficient evidence that visitation would pose a grave threat to the Children. Mother's Brief at 23. According to Mother, the record lacks evidence that visitation with Mother posed a grave threat to the Children due to Mother suffering from a grave moral deficiency. *Id.* at 25. On the contrary, Mother asserts, the juvenile court found at the August 15, 2014 hearing that Mother had been fully compliant with her objectives and directed that Mother be allowed visitation. *Id.* (citing Dependency Review Order, 8/15/14). Additionally, Mother continues, the juvenile court heard evidence that the Children "wanted to make contact and spend time with their mother, even if they had to 'sneak' to do it." *Id.* at 26. Mother also asserts that "the March 24, 2014 report prompting the removal of the [C]hildren, the report that alleges Mother's violation of the safety plan, was

unfounded" and, therefore, should not have been considered by the juvenile court. *Id.* at 26–27 (citing N.T., 10/20/14, at 83; 23 Pa.C.S. § 6337(a); 55 Pa. Code § 3490.34). Finally, Mother argues:

> No new testimony on the threat of future harm to the [C]hildren was admitted on October 20, 2014. No testimony that even supervised visitation would severely endanger the [C]hildren was admitted or allowed. Therefore, there was no evidence to determine that Mother possessed a moral deficiency constituting a grave threat to the [C]hildren.

*Id.* at 28.[5]

In a dependency case,

> [t]he standard against which visitation is measured ... depends upon the goal mandated in the family service plan. Where ... reunification still remains the goal of the family service plan, visitation will not be denied or reduced unless it poses a grave threat. If ... the goal is no longer reunification of the family, then visitation may be limited or denied if it is in the best interests of the child or children.

_____

[5] In support of her position, Mother relies on *In the Interest of Rhine*, 456 A.2d 608 (Pa. Super. 1983). We distinguish that case factually. The *Rhine* Court determined that the aggregate evidence from five hearings "did not rise to the level of clear and convincing, competent evidence of a grave threat to the child." *Id.* at 620. "There was no attempt to relate [the child's] difficult conduct to [the parents] as, in fact, [the parents] had been prevented from visiting [their daughter] for several months before this behavior occurred." *Id.* Moreover, the evidence demonstrated that the father's health issue and the mother's personal issue were being effectively managed and resolved. *Id.* Contrarily, the evidence at hand rose to the level of clear and convincing evidence that Mother used a belt or cord—or allowed Aunt to use a belt or cord—to discipline the Children, resulting in permanent disfigurement. Moreover, Mother admitted that she would continue to use corporal punishment because she was not going to allow the Children to run her home. N.T., 05/01/14, at 39, 47, 61, 64–65.

> *In re B.G.*, 774 A.2d 757, 760 (Pa.Super.2001) (quoting *In re C.J.*, 729 A.2d 89, 95 (Pa.Super.1999)).  The "grave threat" standard is met when "the evidence clearly shows that a parent is unfit to associate with his or her children;" the parent can then be denied the right to see them.  *In re C.J.*, *supra* at 95.  This standard is satisfied when the parent demonstrates a severe mental or moral deficiency that constitutes a grave threat to the child. *See id.*

*In re C.B.*, 861 A.2d 287, 293–294 (Pa. Super. 2004).

Here, at the conclusion of the October 20, 2014 hearing, the juvenile court denied visitation in the following context:

> [CHILD ADVOCATE]:  And I would ask, given your ruling today, that you suspend visits with [Mother].
>
> THE COURT:  At this point --
>
> [DEFENSE COUNSEL]:  Objection.
>
> THE COURT:  -- at this point, we'll suspend the visits with [Mother].
>
> *  *  *
>
> [DEFENSE COUNSEL]:  -- is there a reason for the Court's -- please, because --
>
> THE COURT:  Because -- based on the ruling of today.
>
> [DEFENSE COUNSEL]:  -- but that doesn't mean that my client can't see her children.  The rights of my client have not been terminated.  My client has not –
>
> THE COURT:  Doesn't have to.
>
> [DEFENSE COUNSEL]:  -- presented a grave threat to these children.
>
> THE COURT:  As of this point, since there's no reasonable efforts, according to the law, and according to the statute, okay, the [DHS] does not have to do anything.  As a matter of fact,

the Court could order [DHS] to file a termination petition as of today, which I'm not doing, because I would like to think I followed the law.

And the law says if that [sic] aggravated circumstances have been found at the time [of] a permanency hearing, which it has, because we're between a permanency hearing, then the Court would give the parties 30 days, and particularly [DHS], to figure out and to explore the goal.

Now, that being said -- means that [DHS] has to explore any other relatives that the children may have as possible resources.

[DEFENSE COUNSEL]: There's a relative here today who has supplied her information, and will continue to supply it to the --

THE COURT: Okay. So, at that point, [DHS] -- [DHS], right now, they [sic] only sole thing they have to do, okay, is to explore if there's any relatives to possibly place these children, okay? That's it.

N.T., 10/20/14, at 92–94. Additionally, in its opinion to this Court, the juvenile court explained the basis for its conclusion that a grave threat to the Children existed:

Mother physically abused the Children to such a degree to demonstrate a severe mental or moral deficiency constituting a grave threat to the safety and welfare of the Children. Mother is a highly educated person and holds a master's degree in social work. (N.T. 05/01/14, pg. 30). Additionally being an adoptive parent, Mother was trained and trained others on not using physical discipline on Children. (N.T. 05/01/14, pgs. 29–30). Mother has worked in a child welfare program for over fifteen years and had ongoing training regarding physical discipline. (N.T. 05/01/14, pgs. 30–31). Mother ordered the Aunt to beat [E.J.] while Mother was in another room. (N.T. 05/01/14, pg. 23). The record established that Mother heard [E.J.] screaming, but did not intervene until after he had been hit 20 times. (N.T. 05/01/14, pgs. 20, 23–24). Children were regularly physically disciplined in Mother's home. (N.T. 05/01/14, pgs. 16, 21–24).

- 15 -

Mother did not check the injuries that the Children sustained on the day of the incident or the day after the incident. (N.T. 05/01/14, pgs. 35–36). The record further established that Mother refused to take the Children to the emergency room when the primary care doctor was not available on the date of the injury. It wasn't until two days later that the Children saw their doctor. (N.T. 05/01/14, pgs. 36–37). The Children specifically mentioned that Mother was the perpetrator of the abuse and that at times Mother directed Aunt to beat the Children. (N.T. 10/20/14, pgs. 27, 43). Dr. Deutsch testified that the Children's injuries were non-accidental injuries which resulted in serious bodily painful injuries. (N.T. 10/20/14, pgs. 29, 34, 35, 55, 57). Mother admitted using physical discipline against her Children, and that she would continue to use physical discipline because she was not going to allow the Children to run her home. (N.T. 05/01/14, pgs. 39, 47, 61, 64–65). Even after a safety plan was put in place, Mother continued to use physical discipline. (N.T. 05/01/14, pgs. 28, 42, 49–50). Dr. Deutsch further testified that the Children ha[d] several old scars that covered their body. (N.T. 10/20/14, pgs. 44, 45). These old scars were consistent with loop marks from belts, indicating physical abuse over a period of time. Based on the violent prolonged nature of Mother's conduct by consistently ordering the beating of the Children whereby [sic] leaving disfigurement marks, the trial court concluded that Mother possessed a moral deficiency constituting a grave threat to the Children. The physical abuse of these Children, in this case by a highly educated trained person in social work, was so heinous and repugnant that the grave threat standard was met when evidence clearly showed that Mother was unfit to associate with her Children; therefore, visits had to be suspended. Mother constituted a grave threat to the safety and welfare of the Children.

Juvenile Court Opinion, 3/3/15, at 6–7.

Our review of the record confirms support for the juvenile court's findings. As the Child Advocate asserts, the May 1, 2014 testimony highlighted the injuries E.J. suffered during the December 16, 2013 whipping by Aunt at Mother's direction. Child Advocate's Brief at 40. Additionally, Dr.

Deutsch's October 20, 2014 testimony informed the juvenile court that the Children had endured ongoing abuse directly by Mother while in her care and had suffered permanent scarring as a result of injuries sustained during multiple instances of physical discipline. N.T., 10/20/14, at 24–26, 51–52, 54–57; 29, 31–34, 40, 44–50, 54–57. Indeed, Dr. Deutsch identified injuries that Dr. Ferran did not note during her December 20, 2013 examination, suggesting that those injuries were sustained after the December 16, 2013 incident and while the safety plan was in place. N.T., 10/20/14, at 48–50, Child Advocate Exhibit 5 at 18.[6] Most importantly,

_____

[6] We acknowledge Mother's complaint that the trial court relied on the March 24, 2014 CPS report, despite it subsequently being unfounded. Mother's Brief at 26–28. However, we conclude Mother's complaint lacks merit. As the Child Advocate observed:

> [Mother's] argument fails for several reasons. First, . . . the Trial Court's decision to suspend visitation was based on a whole host of reasons, which would have been legally sufficient without [the challenged] statement. *See* Trial Court Opinion at 6–7.
>
> Second, the testimony offered by DHS was limited to the fact that a report had been made that Mother had punished [E.J.] physically with a belt and that the report was under investigation. N.T. 5/1/14, 28.
>
> * * *
>
> Third, [Mother] conflates and confuses the violation of a safety plan with an indicated report of abuse. [Mother's] Brief at 26–28. . . . The Court's determination that Mother violated the safety plan is well-supported by the evidence, independent of whether her violation of the safety plan constituted abuse under the Child Protective Services Law (CPSL). The testimony was

*(Footnote Continued Next Page)*

despite her training not to use physical discipline on the Children, Mother did so—or directed Aunt to discipline the Children—without remorse or regard for the Children's well-being. N.T., 5/1/14, at 20–24, 33–37, 74, 77–78.

Notwithstanding her education and training, Mother turned a blind eye to the Children's injuries, her role in causing them, and the destructive impact of physical discipline in this case. Two of the Children made suicidal gestures, demonstrated significant behavioral issues, and were referred for wrap-around services. Additionally, E.J. was hospitalized, and J.J. entered a partial program for services. All of the Children were candidates for trauma therapy, and all denied feeling safe in Mother's home because they had been whipped with a belt and hit with a wire. Child Advocate Exhibit 5 at 1, Exhibit 6 at 1, Exhibit 7 at 1.

Based on the foregoing, we discern no error in the trial court's legal conclusion that Mother's repeated use of physical discipline—or her directing Aunt to whip the Children—which resulted in disfiguring marks, emotional trauma, and stress-related behavior constituted a grave threat to the Children. Therefore, we affirm the cessation of visitation.

Order affirmed.

_(Footnote Continued)_ _____

clear that E.J. reported being beaten with a belt by Mother after the safety plan was instituted. N.T. 5/1/14, 28, 41–42, 50.

Child Advocate's Brief at 48–50 (footnotes omitted).

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary


Date: 8/26/2015