J-A09045-24

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| IN THE INTEREST OF: A.N.S., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| APPEAL OF: T.S., MOTHER | : | |
| | : | |
| | : | No. 1432 WDA 2023 |

Appeal from the Order Entered November 3, 2023
In the Court of Common Pleas of Blair County Juvenile Division at No(s):
Docket No. CP-7-DP-00056-2023,
FID: 7-FN-00031-2023

BEFORE: DUBOW, J., KUNSELMAN, J., and NICHOLS, J.

MEMORANDUM BY NICHOLS, J.:                    **FILED: July 25, 2024**

T.S. (Mother) appeals from the order granting the petition filed by Blair County Children, Youth & Families (the Agency) and adjudicating A.N.S. (Child) dependent. Mother argues that the trial court erred in granting the Agency's petition, placing Child in foster care, and declining to allow Mother in-person visitation with Child. We affirm.

By way of background, the family has been in contact with the Agency and receiving services since 2019. *See* N.T. Hr'g, 7/21/23, at 3. Specifically, the record reflects:

Between 10/07/2019 and 03/10/2023, [the Agency] received eight (8) different general protective services (GPS) referrals for the family alleging the following concerns: sexual assault, [Mother] being involuntarily hospitalized (302),[1] domestic violence (broken furnishings had been observed in the home),

---

[1] *See* 50 P.S. § 7302.

[Mother's] erratic behaviors, and [Child's] truancy during the COVID-19 pandemic. All eight (8) of the incidences were screened out due to unsubstantiated concerns, forwarded to local law enforcement (LEO) for them to investigate, or closed during the assessment phase of the case because the initial validated concerns had since been alleviated.

The family has been involved with the following services in the past and/or currently: Home Nursing Agency (HNA) case management (Mother has gone through about 4 case managers herself due to her lack of consistency and failure to follow through), Evolution Counseling (for the past 4 years, approximately), mental health counseling through Primary Health Network (PHN), Suboxone treatment, family-based counseling (just recently), and Altoona Cyber Academy ([C]hild was most recently in the 6th grade). In previous conversations that caseworkers had with [Mother], she described that she and [Child] had a significant history of trauma (including sexual abuse).

Additionally, [Mother] alleged that she had been previously diagnosed with ADHD/ADD, Agoraphobia, Panic Attacks/Anxiety, and Severe Depression, and [Child] had been diagnosed with PTSD, Separation Anxiety, and ADHD (for which [C]hild is receiving prescribed medication through ACRP). Allegedly, [Child] was also receiving psychiatric services as well, but [C]hild was discharged after several late arrivals or "no shows" for scheduled appointments. Furthermore, [Mother] had recently cancelled her and [Child's] necessary medication management appointments, and [Child] was desperately in need of refills.

Dependency Pet., 7/14/23, at 6.[2]

On July 10, 2023, the Agency received a GPS report stating that there were ongoing concerns regarding Mother's mental health. *See* Dependency Pet., 7/14/23, at 6. That same day, Judge Ilissa Zimmerman granted emergency protective custody to the Agency and placed Child into foster care. *See id.* at 8.

---

[2] We note that the parties stipulated to the contents of the dependency petition at the dispositional hearing. *See* N.T. Hr'g, 7/21/23, at 2.

The Agency filed a dependency petition on July 14, 2023. Therein, the Agency alleged that Child was without proper care or parental control due to concerns regarding Mother's mental health. *See id.* at 6-7. Specifically, the petition stated:

[Mother] has already been diagnosed with schizophrenia . . . and the 7/10/2023 GPS referral was the [third] such referral that the Agency had received concerning the currently poor state of [Mother's] mental health.

[Child] has sporadically stayed with a friend, Nanette Williams, sometimes as long as up to 1 month--when [Mother] was acting paranoid and/or admitted for a psychiatric hospitalization. During these time periods when [Mother] was struggling with her mental health, [Mother] was unable to provide [Child] with a nurturing environment or a consistent schedule.

[Mother] recently threw away [Child's] mattress and other belongings, and the police responded to the home during one of [Mother's] manic episodes (unknown outcome).

Service providers had observed that, as of late: 1) [Mother] did not appear to be herself as she was "distant" (had a flat affect); 2) [Mother] was mumbling her words and was unable to complete her thoughts/sentence[s]: and 3) [Mother] was also seen retreating into her bedroom often, sitting on the edge of her bed talking to herself, and laughing as if someone or something was amusing, however, no one was there with her.

[Mother] recently reported that her home caught on fire; however, this was determined to be false when firefighters and the police responded on scene to the home (she blamed it on the dishwasher appliance).

A domestic violence situation had occurred in the family's home over the weekend prior. More specifically, it was reported that [Mother] had been arguing with her paramour, Christopher Harf, over the past few days primarily because she believed that he had been cheating on her (among a variety of other issues).

As a result of the recent trauma in the home caused by the family infighting, [Mother] took [Child] (age 12) to CRISIS on or about

- 3 -

07/07/2023 where [Child] was subsequently diagnosed with depression, received treatment, and then discharged home.

As a result of the above GPS referral, the caseworker met with [Mother] and [Child] on 7/10/2023.

During the meeting with the family, [Mother] stated that there was a supposed robbery of her and [Child's] prescribed medication, and there were concerns that [Mother] may have given [Child] double (2x) the amount of her prescribed medication (Concerta & Buspar) as she did not recall giving them to [C]hild already (the Agency later discovered that a pill count of [C]hild's medication was "short" and a refill would be required).

Additionally, [Agency] caseworkers had observed [Mother] acting paranoid and constantly throwing away drinks in the home because she claimed that her boyfriend, Christopher, was trying to poison her (she alleged that the drinks tasted "funny"). [Mother] also made comments about her mail being tampered with. [Agency] caseworkers determined that [Mother] had viable reasons for her strange actions, but her explanations became more bizarre in nature when further discussions were had with [Mother].

Moreover, it was unclear whether [Mother] was following through with her mental health appointments, case management, and service providers' recommendations.

When the [Agency] caseworker interviewed [Child] on 7/10/2023, [Child] stated that she was miserable on a daily basis while in the care of [M]other, and the caseworker observed that [Child] was noticeably "shaking and trembling." In addition, [Child] had told her service providers/treatment team that she was scared to be left alone with [M]other. The caseworker also observed that [Child] seemed to be highly "parentified" for her young age (12). [Child] has described that she clearly loves [M]other, but [C]hild stated that she would like to stay somewhere else until [Mother] can get further help for her mental health.

As a result of the above, [Mother] was asked about possible placement of [Child] outside the home. [Mother], however, only agreed to the caseworker contacting an aunt who lives in Tennessee (TN). [Mother], however, did not have a phone number for the aunt so the aunt could not be contacted.

To further complicate matters, [Mother] denied having any sort of mental health issues and denied needing assistance. Moreover, [Mother] does not have a phone, making it difficult for the caseworker or service providers to contact her.

*Id.* at 7-8.

The order of adjudication further summarized the subsequent factual

and procedural history as follows:

The adjudicatory dispositional hearing was conducted on behalf of [Child], on the dates of July 21, 2023 and August 25, 2023 . . . . The parties, through their counsel, entered into a stipulation to the extent that if an Agency worker were called to testify, that testimony would be consistent with the allegations set forth in the dependency petition, without an admission as to those facts. A Family Finding Report to the Court was submitted by the Agency and marked as Exhibit 1.

Jessilyn Williams, Blended Case Manager of Western Behavioral Health of the Alleghenies, has been involved with this family for approximately four years. The UPMC and ACRP have previously terminated their services during the last six months for a lack of attendance and participation in treatment. [Child] was the identified patient. It is alleged that [Mother] exhibits paranoid thinking, delusions of reference, confusion, and perhaps auditory hallucinations. On December 12, 2022, Ms. Williams visited the [family's] residence: however, [Child] was not there, but rather in respite care at the residence of a family friend, [Ms. Williams] [Child] has stayed with [Ms. Williams] on several occasions when [M]other is either hospitalized or otherwise unable to care for her due to her unstable mental status. It is also noted that [Mother] was admitted under Section 302 of the Mental Health Procedures Act, to UPMC, pursuant to an involuntary commitment that occurred on or about January 17, 2023. Prior to admission, [Mother] received a summons for disorderly conduct; those charges were resolved before the assigned [magisterial district judge].

[Mother] had resided with her paramour, Christopher Harf. They have been separated since July, 2023, but intend to reunite. [Child] refers to Mr. Harf as dad. [Child's] natural father is unknown. [Mother] claimed that her mail has been stolen and

unknown individuals have tampered with her medication. [Mother] states that she now takes her medication as p[re]scribed on a regular basis.

Ashley Nearhoof has provided services to this family through the Evolution Express Program. The Evolution Express Program provides support to [Child] and works with her socialization and coping skills. The program provides both group and individual services. The Evolution Express Program will discontinue service in approximately one month. Ms. Nearhoof wants the opportunity to assist [Child] in participating in extracurricular school activities. [Child] has expressed an interest in drama, cheerleading, and an exercise program. [Mother] has participated in the "Mom's Club," where she attended one session through the months of February to July [of] 2023.

Chelsea Clark, also of the Evolution Counseling Services; closed with this family on August 23, 2023. [Child's] contract with the Agency had expired. [Child] will attend the 7th grade at the Altoona Area School District. The Family Based Program Provided by CenClear Services will also terminate in the near future. A two week extension has been granted through September 7, 2023. In place of the Family Based Intervention Program, the Maintain Strength Program . . . will be initiated. This program is not as intense as the Family Based Intervention Program, however, [it] will provide ongoing support on behalf of [Child]. [Child] will also participate in the Student Assistance Program.

[Child] has consistently stressed that she does not want to return to [M]other's home. [Mother] has the assistance of her Case Manager, and has attended her scheduled appointments with her personal care physician and with the Department of Motor Vehicles. [Mother] has weekly phone contacts with [Child] at her foster care residence. It has been noted that [Mother] tends to antagonize [Child] by talking about sensitive issues such as [Child's] foster treatment, and the fact that [Mother] wants [Child] returned to her residence at the present time. [Mother] receives case management services through the Behavioral Health of the Alleghenies program and Tiara Novak. Ms. Novak will also assist in assuring that [Mother] attends her medication management program through ACRP. Currently [Mother] receives medication management and case management services through ACRP, Behavioral Health of the Alleghenies, the Primary Health Network, and the CleanSlate Program. [Child's] case manager will make a

referral for individual trauma therapy on her behalf, either through ACRID or UMPC Western Behavioral Health of the Alleghenies.

[Mother] testified at this proceeding. She did not exhibit any significant psychotic symptoms at this time, however, her affect was flat and she has no insight. She has no understanding as to why her daughter would retain negative feelings about her. As mentioned above, [Child] "has consistently stated that she does not want to return to [M]other's home at this point or at any time in the future. [Child] is willing to participate in a bi-weekly phone conversation with [M]other, to be supervised by the Path House. These contacts will be on an alternate week basis, in an effort to ease [Child] [into] establishing some resemblance of a relationship with [M]other at this time.

\* \* \*

Matthew Dombrosk, Esquire, as Guardian *Ad Litem* [(GAL)], reiterated that [Child] does not want visitation or contact with [M]other at this time. However, he does not object that supervised phone contact via Pathways facility on a bi-weekly basis is appropriate.

[Child's] foster mother, testified at this hearing. She notes that Christopher Harf has sent several text messages to [Child]. [Child] is receptive to Mr. Harf and would like to have visitation with him and her older sibling. She does refer to Mr. Harf as her father. [Foster mother] described the atmosphere of the phone conversations between [Child and Mother]. She states that [Child] is often anxious, crying and on at least one occasion, hyperventilated following the phone call. [Child] is fearful of [M]other, apparently related to their past history and it has yet to be determined whether this relationship can be salvaged. A list was provided of [Child's] personal property that remains at [M]other's residence, which will be provided to her by the Agency.

Order of Adjudication, 11/3/23, at 5-6.

Following the two-day hearing, the hearing officer issued an adjudication of dependency by recommendation. After Mother filed exceptions, the trial court conducted a hearing, then issued an order affirming the hearing officer's adjudication of dependency. *See id.* at 5-7.

Mother filed a timely notice of appeal and a simultaneous Pa.R.A.P. 1925(b) statement. The trial court issued a Rule 1925(a) opinion adopting the officer's findings.

Mother raises the following issues on appeal:

1. Whether or not the trial court erred in declaring [C]hild dependent?

2. Whether or not the trial court erred in removing [C]hild from Mother's care and placing in foster care?

3. Whether or not the trial court erred in not awarding Mother in-person visitation when the goal was return to parent?

Mother's Brief at 4 (some formatting altered).

**Finding of Dependency**

In her first claim, Mother argues that the trial court erred in concluding that Child was dependent because the Agency failed to prove that Child was without proper parental care. *Id.* at 11. In support, Mother relies on her own testimony that she disagreed with her recent diagnosis for schizophrenia and claims that she had been regularly taking medication and participating with counseling. *Id.* at 11-13. Mother also notes that she has lived in the same house for nine years and that her home was physically appropriate, clean, and had working utilities. *Id.* at 11. Therefore, Mother concludes that the Agency failed to meet its burden to prove that Child was dependent. *Id.* at 14.

Initially, we note that

the standard of review in dependency cases requires an appellate court to accept the findings of fact and credibility determinations of the trial court if they are supported by the record, but does not require the appellate court to accept the lower court's inferences

or conclusions of law. Accordingly, we review for an abuse of discretion.

*In re R.J.T.*, 9 A.3d 1179, 1190 (Pa. 2010) (citations omitted). "The trial court is free to believe all, part, or none of the evidence presented, and is likewise free to make all credibility determinations and resolve conflicts in the evidence." *In re M.G.*, 855 A.2d 68, 73-74 (Pa. Super. 2004) (citations omitted).

"The burden of proof in a dependency proceeding is on the petitioner to demonstrate by clear and convincing evidence that a child meets that statutory definition of dependency." *In re G.T.*, 845 A.2d 870, 872 (Pa. Super. 2004) (citation omitted).

A "dependent child" is defined as a child who

is without proper parental care or control, subsistence, education as required by law, or other care or control necessary for his physical, mental, or emotional health, or morals. A determination that there is a lack of proper parental care or control may be based upon evidence of conduct by the parent, guardian or other custodian that places the health, safety or welfare of the child at risk[.]

42 Pa.C.S. § 6302.

"Proper parental care" is care "which (1) is geared to the particularized needs of the child and (2) at a minimum, is likely to prevent serious injury to the child." *In re A.B.*, 63 A.3d 345, 349 (Pa. Super. 2013) (citation omitted). Proof that a parent has committed abuse is not necessary for a child to be found dependent under the Juvenile Act. *In re R.R.*, 686 A.2d 1316, 1317 (Pa. Super. 1996).

In the instant case, the trial court concluded that the "order of adjudication and the record in this matter evidence a situation where . . . Mother's mental health issues prevented her from being []able to care for [C]hild and caused [C]hild who is 12 years of age [to] fear[] for her safety and not want[] to be in . . . Mother's home." **See** Trial Ct. Op., 12/12/23, at 3 (some formatting altered).

Following our review of the record, we discern no abuse of discretion by the trial court. **See R.J.T.**, 9 A.3d at 1190. As noted previously, Mother has been diagnosed with schizophrenia, has struggled with her mental health for several years, and the July 10, 2023 GPS referral was the third referral that the Agency had received concerning the poor state of Mother's mental health. **See** Dependency Pet., 7/14/23, at 6-7. During the dispositional hearing, Cenclear family therapist Sarah Selinski,[3] testified that Child "feels as if the house is unsafe, that her mom is unsafe, and until her mom gets . . . the mental help she needs," Child did not want to return to Mother's home. N.T. Hr'g, 7/21/23, at 35.

Although Child is required to take daily medication, there were concerns as to whether Mother was accurately dosing Child's medication, and the Agency later discovered that a pill count of Child's medication was "short," which required a prescription refill. **See** Dependency Pet., 7/14/23, at 7.

---

[3] We note that the transcript from the hearing indicates that the stenographer was unable to hear the witness's last name and therefore spelled her last name phonetically. **See** N.T. Hr'g, 7/21/23, at 32.

Additionally, Child reported that Mother "had given her an extra [dose] when she had told her that she had already taken her medications." *See* N.T. Hr'g, 7/21/23, at 34. Additionally, Child's family physician indicated to the Agency that there had been "medication compliance concerns" while Child was in Mother's care which prevented the doctor's office from seeing Child for medication management. *Id.* at 20.

On this record, we agree with the trial court that the Agency met its burden to demonstrate that Child was without parental care and control. *See* ***G.T.***, 845 A.2d at 872; *see also* ***A.B.***, 63 A.3d at 349. Therefore, Mother is not entitled to relief.

## Foster Care

Mother also argues that the trial court erred by placing Child into foster care. Mother's Brief at 14-16. In support, Mother contends that Child "could have stayed in the home, subject to conditions and limitations as the [c]ourt prescribes, including supervision and/or preservation services" and that she would allow staff to monitor her "mental health and her parenting while [C]hild was in the home." *Id.* at 15. Finally, Mother claims that "[t]he Agency and [t]rial [c]ourt used . . . Mother's mental health diagnosis and history against her, but . . . Mother had fit and appropriate care providers for [C]hild when she was hospitalized . . . ." *Id.* at 16. Therefore, Mother concludes that even "if dependent, [C]hild could have still been safely maintained in . . . Mother's physical custody." *Id.*

## § 6351. Disposition of dependent child

**(a) General rule.**—If the child is found to be a dependent child the court may make any of the following orders of disposition best suited to the safety, protection and physical, mental, and moral welfare of the child:

(1) Permit the child to remain with his parents, guardian, or other custodian, subject to conditions and limitations as the court prescribes, including supervision as directed by the court for the protection of the child.

(2) Subject to conditions and limitations as the court prescribes transfer temporary legal custody to any of the following:

(i) Any individual resident within or without this Commonwealth, including any relative, who, after study by the probation officer or other person or agency designated by the court, is found by the court to be qualified to receive and care for the child.

(ii) An agency or other private organization licensed or otherwise authorized by law to receive and provide care for the child.

(iii) A public agency authorized by law to receive and provide care for the child.

(2.1) Subject to conditions and limitations as the court prescribes, transfer permanent legal custody to an individual resident in or outside this Commonwealth, including any relative, who, after study by the probation officer or other person or agency designated by the court, is found by the court to be qualified to receive and care for the child. A court order under this paragraph may set forth the temporary visitation rights of the parents. The court shall refer issues related to support and continuing visitation by the parent to the section of the court of common pleas that regularly determines support and visitation.

(3) Without making any of the foregoing orders transfer custody of the child to the juvenile court of another state if authorized by and in accordance with section 6363 (relating to ordering foreign supervision).

42 Pa.C.S. § 6351(a).

This Court has further noted that

[w]hen a child is adjudicated dependent, the child's proper placement turns on what is in the child's best interest, not on what the parent wants or which goals the parent has achieved. Moreover, although preserving the unity of the family is a purpose of the [Juvenile] Act, another purpose is to "provide for the care, protection, safety, and wholesome mental and physical development of children coming within the provisions of this chapter." 42 Pa.C.S. § 6301(b)(1.1). Indeed, the relationship of parent and child is a status and not a property right, and one in which the state has an interest to protect the best interest of the child. When a trial court is determining where or with whom a child should be placed, the express wishes of the child do constitute an important factor that must be carefully considered in determining the child's best interests. The child's wishes must be based upon good reasons, and the child's maturity and intelligence must be taken into account. Finally, we note that the weight to be attributed to the child's testimony can best be determined by the judge before whom the trial court testified.

*In re K.C.*, 903 A.2d 12, 14-15 (Pa. Super. 2006) (some citations omitted and some formatting altered).

Here, as noted previously, the trial court credited the hearing officer's findings, which indicated that Child should remain in foster care. *See* Trial Ct. Op., 12/12/23, at 3; *see also* Order of Adjudication, 11/3/23, at 5-6.

Following our review of the record, we discern no abuse of discretion by the trial court. *See R.J.T.*, 9 A.3d at 1190. As noted by the trial court, Child remains in foster care and "has consistently stressed that she does not want to return to her mother's home." Order of Adjudication, 11/3/23, at 5-6; *see also* N.T. Hr'g, 7/21/23, at 35 (reflecting testimony from an Agency caseworker who stated that Child "feels as if the house is unsafe, that her

mom is unsafe" and that Child does not want to return home until Mother "gets the mental help she needs"). Further, the record contains testimony from Cenclear family therapist Sarah Selinski, who confirmed that Child would be "at risk" if she were to be returned to Mother's home, that Mother would continue to miss medication appointments, and that Child would continue to be fearful of returning home until Mother receives help. *See* N.T. Hr'g, 7/21/23, at 56. Finally, the record reflects that Child's physician was previously unwilling to see Child for medication management due to "medication compliance concerns," but had agreed to see Child after she was living in foster care. *Id.* As noted previously, it is within the trial court's province to believe all, part, or none of the evidence. *See M.G.*, 855 A.2d at 73-74. Therefore, the trial court did not err in concluding that it would serve Child's best interests to remain in foster care. *See K.C.*, 903 A.2d at 14-15. Accordingly, Mother is not entitled to relief.

### In-Person Visitation

Finally, Mother argues that "[t]he [trial c]ourt erred in not ordering in-person visitation (even if supervised) and professional reunification to work on whatever issue existed between . . . Mother and [C]hild." Mother's Brief at 17. Mother claims that "[t]o not offer . . . Mother even professionally supervised visitation is to fail to make any meaningful effort to maintain, restore or strengthen the parent-child relationship when the goal is 'return to parent.'" *Id.* at 19.

The polestar and paramount concern in evaluating parental visitation, in dependency as well as non-dependency situations, is the best interests and welfare of the children. Once a child is adjudicated dependent, the issues of custody and continuation of foster care are determined according to a child's best interests. Thus, it has been said that the sole concerns of a court called upon to enforce a parent's right of visitation are the welfare and best interests of the child.

*In re C.J.*, 729 A.2d 89, 94 (Pa. Super. 1999) (citations omitted and some formatting altered).

In cases where the goal is reunification, a parent may not be denied visitation "except where a grave threat to the child can be shown." *In re M.B.*, 674 A.2d 702, 705 (Pa. Super. 1996).

It has long been the law in this Commonwealth that "only when the evidence clearly shows that [parents] are unfit to associate with [their] children should [they] be denied the right to see them." *Commonwealth ex rel. Turner v. Strange*, 115 A.2d 885, 886 (Pa. Super. 1955); *see also In re Damon B.*, 460 A.2d 1196 (Pa. Super. 1983); *In re Rhine*, 456 A.2d 608, 613 (Pa. Super. 1983) ("Visitation has been limited or denied only where the parent has been shown to suffer from severe mental or moral deficiencies that constitute a grave threat to the child."); *In re Mary Kathryn T.*, 629 A.2d 988 (Pa. Super. 1993); *In re Adoption of Michael J.C.*, 473 A.2d 1021 (Pa. Super. 1984).

*C.J.*, 729 A.2d at 95 (citation omitted, some formatting altered).

Here, the disposition order stated the following with respect to visitation:

Essentially a status quo in this case will be maintained, with the exception that [Mother] may have supervised phone contact with [Child] on a bi-weekly basis. The phone calls will be monitored to make an effort to ensure that the content of the conversations do not create undue anxiety for [Child]. Christopher Harf may have visitation with [Child], supervised at the Path House upon his request; Visitation with Mr. Harf was requested by [Child].

* * *

> [T]here will be no face to face visitation between [Child] and [M]other [] due to the intense negative attitude [Child] harbors against her mother. A visitation schedule may be initiated by the Agency upon the recommendation of Dr. O'Hara. The suspension of visits is temporary and will be reevaluated at the next proceeding.

Order of Adjudication, 11/3/23, at 6.

Following our review of the record, we discern no abuse of discretion by the trial court. *See R.J.T.*, 9 A.3d at 1190. As noted previously, Child indicated that she "does not want visitation or contact with [M]other at this time." *See* Order of Adjudication, 11/3/23, at 6. Further, Child's foster mother testified that Child becomes "really upset" after calls with Mother and continues to indicate that she does not want any contact with Mother. *See* N.T. Hr'g, 7/21/23, at 65. On one occasion, Child's foster mother indicated that Child was

> so upset she was literally [] almost passing out. She was choking, breathing real heavy and I had to try to get her to calm down and every time it's landed in really, really [] strong crying and kind of like anxiety and she has to [] go to her room and lay down but usually I would try to [] find something to do to calm her down.

*Id.* at 65. Additionally, in light of Child's negative reaction to contact with Mother, Child's GAL recommended that there be no further contact until there was a "therapeutic recommendation from [Child's] counselor." *See* N.T. Hr'g, 8/25/23, at 71-72. Therefore, the trial court did not err in temporarily limiting Child's visitation with Mother to supervised phone calls. *See C.J.*, 729 A.2d

- 16 -

at 97; *see also M.B.*, 674 A.2d at 705. Accordingly, Mother is not entitled to relief. For these reasons, we affirm.

Order affirmed. Jurisdiction relinquished.

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary

DATE: 07/25/2024